IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ACME Contracting, Ltd. | Case No.  2:07-CV-10950 |
| Plaintiff, | Hon. Sean F. Cox |
| -vs- | |
| TolTest, Inc., et. al. | |
| Defendants. | |

**DEFENDANTS' TRIAL BRIEF**

Richard M. Kerger (Ohio #0015864)
Kimberly A. Conklin (Ohio #0074726)
KERGER & ASSOCIATES
33 S. Michigan St., Suite 100
Toledo, Ohio 43604
Telephone: (419) 255-5990
Fax: (419) 255-5997
Email: rkerger@kergerkerger.com

William J. Lamping (P-30785)
VESTEVICH, MALLENDER,
DUBOIS & DRITSAS, P.C.
6905 Telegraph Road, Suite 300
Bloomfield Hills, Michigan 48301-3160 Telephone: (248) 642-1920
Fax: (248) 642-2095
Email: wlamping@vmddlaw.com

Now come Defendants TolTest Inc and Berkeley Regional Insurance Company and submit the following Trial Brief in accordance with the Court's March 4, 2008 Trial Order.

**DEFENDANTS' ROAD MAP**

This matter arises out of a construction subcontract relationship between Defendant TolTest and Plaintiff Acme.  On June 14, 2006, TolTest and Acme executed an Agreement for the demolition of two buildings on the campus of Georgia Tech in Atlanta, Georgia:  the Neely Reactor and Electronics Research Building (ERB).  According to the Agreement, Acme was required to perform all labor, supervision, equipment and transportation to complete various tasks listed in the Scope of Work in TolTest's Subcontract 11000-01 with General Contractor Whiting Turner.  TolTest was to pay Acme $1,010,018.00.

Acme has brought this action for (1) breach of the Agreement based on TolTest's Failure to pay Acme for its final three payment applications and (2) for delay damages incurred by Acme throughout the course of the project which Acme claims is attributable to TolTest's "interference and mismanagement".

 TolTest's intends to show that there was no breach of the Agreement and that payment was denied because Acme failed to meet the conditions precedent to payment.  TolTest will show that taking into account payments made and the ten change orders issues during the project, there is an outstanding amount owed to Acme of $348,686.73.  Upon Acme meeting the conditions precedent to payment, which at this point means furnishing the appropriate lien waiver, TolTest will remit payment to Acme.

TolTest further intends to show that other than what Acme is owed for work performed, Acme is not entitled to delay damages because Acme did not follow the contractual requirements for claiming and collecting additional payment for delay.  The Agreement required Acme to make delay claims in writing and that no damages would be awarded unless awarded by the client, Whiting

Turner. Furthermore, TolTest will demonstrate that any delay Acme did experience on the project is not attributable to TolTest.

There is a second aspect to this case which arises out of a separate phase of the Project- TolTest's Subcontract 11000-04: Grading and Shoring, also with Whiting-Turner. Originally, Acme submitted a bid to TolTest for this second phase. However, the parties were not able to come to a final agreement and TolTest ended up self-performing. Acme's failure to perform on its bid is not at issue in this case. What is at issue arises because, while the parties were negotiating the terms of the failed agreement, Acme did perform some amount of work under the scope of Subcontract 11000-04 on a "time and materials" basis.

Acme claims it performed $399,371.85 worth of time and materials work and is owed this much under a theory of quantum meruit. TolTest does not dispute that Acme is entitled to payment for work it performed outside the bounds of any contract. However, using work reports submitted by Acme and correspondence between the parties, TolTest will show that Acme only worked for five days on this phase of the project, from July 27th through August 7th. TolTest will also show that using these same work reports, as well as the labor and equipment rates in the Whiting Turner Contract, it calculates that Acme performed a total of $5,427.95 worth of time and materials work.

As an alternate theory to its entitlement to $2,310,648.14, the sum of Acme's breach of contract, delay and quantum meruit claims, Acme argues that this amount should be awarded as an account stated. TolTest will show that there was never an account stated for $2,310,648.14 and that TolTest clearly rejected Acme's Pay Applications 5 through 7, Acme's delay claims and Acme's invoice for time and materials charges.

At the close of trial, TolTest will ask the Court to dismiss Acme's claims for breach of contract and delay damages under Subcontract 11000-01 and hold that the proper amount due and

owing to Acme for time and materials charges arising out of the scope of Subcontract 11000-04 is $5,427.95 and not $399,371.85.

## PROPOSED FINDINGS OF FACT

1. On May 12, 2006, a fire broke out in the ERB while TolTest was performing hazardous materials abatement causing a one day work stoppage.

2. Acme mobilized to the Project site in Atlanta on May 30, 2006 and commenced work on the project on May 31, 2006.

3. Acme therefore was able to start work on the project in accordance with the June 9, 2006 Agreement with TolTest, Purchase Order 01652[1], which included a period of performance of May 30 through August 30, 2006.

4. Acme was therefore not delayed 16 days by the fire in the ERB.

5. Acme did not, at any time before signing the Agreement or after, submit a change order request pursuant to the Agreement for delay based on the occurrence of the fire.

6. The "Project Schedule" attached to Acme's Complaint[2], was not made a binding part of the Agreement between TolTest and Acme nor was any schedule incorporated into the terms of the Agreement.

7. On June 23, 2006, Acme submitted to TolTest a change order request for $141,076.81[3] in delay damages stemming from Georgia Tech's refusal to sign a waste profile for construction debris related to the demolition of the ERB.

8. TolTest discussed Acme's change request with Whiting-Turner and Whiting Turner indicated that it would not approve such a request as it had no authority to require Georgia Tech to sign a waste profile. TolTest shared this with Acme and Acme did not raise the issue again.

---

[1] Joint Exhibit 31
[2] Joint Exhibit 149
[3] Joint Exhibit 56

9. There is no provision in the Agreement requiring TolTest or Whiting Turner to make arrangements for Acme's waste disposal.

10. Any delay stemming from Acme's inability to dispose of its waste is not attributable to TolTest.

11. Acme did not submit a change order request for delay based on TolTest's "failure to follow its work plan" inside the Neely Reactor.

12. On July 12, 2007, during the demolition of the Neely Reactor, Acme indicated to TolTest that it was in fact not making a delay claim against TolTest, but just wanted to make a record of delays in case Whiting Turner raised an issue with respect to timing on the project.

13. Early on during the Neely demolition, Acme changed its means and methods of removing the Neely Reactor Dome from a shearing method to a cutting method.

14. The change in Acme's means and methods had a chain reaction in that the change meant that TolTest would need to perform additional hazardous abatement it had not planned on.

15. On July 18, 2006, during the demolition of the Neely Reactor, Acme stopped work so that paint on the dome could be tested for PCB's.

16. Acme's equipment was non-functional on numerous days during the demolition of the Neely reactor.

17. During the demolition of the Neely Reactor, the Atlanta area experienced torrential down pours hampering work progress.

18. TolTest and Acme collaborated to design and erect a containment structure over the Neely Reactor to contain hazardous materials during demolition.

19. Acme did not object to the design or construction of the containment structure.

20. The containment structure was designed to be in place for a short period of time, which would have been adequate for Acme's original means and methods of demolition. The

change in means and methods, the rain, the PCB testing and Acme's numerous equipment malfunctions resulted in the containment structure remaining in place much longer than anticipated.

21. Following complaints from Whiting Turner and concerns regarding the structural stability of the containment structure, TolTest decided to dismantle the original containment structure and erect a second, more sturdy structure.

22. Any delay Acme experienced with respect to the demolition of the Neely Reactor is not attributable to actions by TolTest.

23. During periods where TolTest was abating hazardous materials, rebuilding the containment structure or removing hazardous waste, Acme always had other tasks to perform on the project site to include erosion controls, site work at the ERB and the ERB parking structure, the construction of the wash vaults, and the removal of underground utilities to name just a few.

24. There was never a time Acme was without scope of work to perform.

25. TolTest took no action to cause Acme delay in the performance of its work.

26. During the project TolTest issued ten contract modifications or "change orders" under Subcontract 11000-01 in compliance with the Agreement, Attachment A, Sections 2 and 4, changing the base contract amount to $944,089.66.

27. Acme's final pay applications 5-7 failed to take into account the ten Change Order's by TolTest in accordance with the Agreement, Attachment A, Section 8.

28. Acme's final pay applications 5-7 also failed to include the proper documentation, namely lien waivers, required as a condition precedent to payment under the Agreement, Attachment A, Section 8.

29. Whiting-Turner refused to pay TolTest until it could obtain a release from its surety because of Acme's failure to submit proper documentation for payment.

30. Whiting Turner released a payment to TolTest's covering Acme's Payment Applications 5-7 on January 22, 2007.

31. TolTest's duty under the Agreement, Attachment A, Section 8 to process payment for Acme's Payment Applications 5-7 was never triggered.

32. The proper amount due and owing to Acme by TolTest for work performed under the Agreement, (Subcontract 11000-01) upon the submission a payment application recognizing the change orders and a corresponding lien waiver is $348,686.73.

33. While Acme clearly performed some work under the second phase of the contract, Subcontract 11000-04, Acme did not submit daily time and materials tickets to TolTest.

34. According to Acme's work reports[4], it performed work on a time and materials basis under the scope of Subcontract 11100-04 on the following five days: July 27, August 2-3 and August 7.

35. According to Acme's work reports, Acme utilized a total of 18 hours of labor on July 27, August 2-3 and August 7.

36. According to Acme's work reports, Acme utilized a total of 23 hours of equipment on July 27, August 2-3 and August 7

37. Using the labor unit rates from the Whiting Turner Subcontract 11000-01[5], page T-35-1, the most Acme is owed for time and materials work is $5,427.95.

38. TolTest rejected the $399,371.87 in time and materials charges submitted by Acme.

39. Acme never submitted an invoice, payment application or demand for $2,310,648.14 to TolTest other than through letters between counsel.

40. TolTest never assented or failed to reject the sum of $2,310,648.14 claimed by Acme.

---

[4] Joint Exhibits 69 & 70
[5] Joint Exhibit 44

7

**PROPOSED CONCLUSIONS OF LAW**

1.      The relationship between Acme and TolTest, with respect to Acme's work performed under 11000-01, is controlled solely by the terms of the Agreement executed on June 9, 2006.

2.      Under the Agreement, Attachment A, Sections 3 and 7, Acme is not entitled to any delay damages that were not allowed and paid by Whiting-Turner.

The Agreement, Attachment A, Section 3: "Schedule-provides:

**The Work shall be performed according to the schedule outlined by TolTest, which may be modified per the instructions of the TolTest Project Manager**.  Time is of the essence in the performance of the Work. SUBCONTRACTOR shall schedule its operations so as to proceed with the orderly construction and completion of his Work on or before the completion date. SUBCONTRACTOR agrees to coordinate his work with any other work to be done on the job by any other contractors whose work may overlap or conflict with the scope of the Work under this Purchase Order. In the event of conflicts, SUBCONTRACTOR agrees to abide by the resolutions and decisions of TolTest. **Any extension of the contract completion date or any portions thereto which may become pertinent and critical in timing during the completion of the Purchase Order may only be granted by TolTest in writing, properly executed and definitively stating that an extension is granted.** Approval of schedules submitted by SUBCONTRACTOR shall not be mandatory, but TolTest reserves the right to reject any schedule which does not agree with the job schedule. **SUBCONTRACTOR shall not be entitled to extra compensation for any suspension, delay or acceleration not specifically allowed and paid to TolTest by its CLIENT for SUBCONTRACTOR's benefit**.

The Agreement, Attachment A, Section 7: "Differing Site Conditions"-provides:

SUBCONTRACTOR **shall notify TolTest, in writing**, of the following unforeseen conditions (hereinafter called Differing Site Conditions), promptly upon their discovery (but in no event later than 14 calendar days thereafter) and before they are disturbed: (a) subsurface or latent physical conditions at the job site differing materially from those indicated, described, or delineated in this AGREEMENT or the job specifications; and (b) unknown physical conditions at the job site differing materially from those ordinarily encountered and generally recognized as inherent in the Work of the character provided for in this AGREEMENT.

TolTest in consultation with its CLIENT, will review the pertinent conditions, determine the necessity of obtaining additional explorations or tests with respect thereto, and advise SUBCONTRACTOR, in writing, of its findings and conclusions If TolTest concludes that

> because of newly discovered conditions a change in the Work is required a Change Order will be issued as provided herein to reflect and document the consequences of the Differing Site Condition.
>
> **In each such case, an increase or decrease in the job price or an extension or shortening of the job schedule, or any combination thereof; will be allowable to the extent that they are attributable to any such difference**.  If TolTest and SUBCONTRACTOR are unable to agree as to the amount or length thereof; a claim may be made therefore as provided herein.
>
> SUBCONTRACITOR's failure to give notice of differing site conditions within 14 calendar days of their discovery or before they are disturbed shall constitute a waiver of all claims in connection therewith whether direct or consequential in nature.

3.      By agreeing to be bound by Section 3 and Section 7, Acme agreed to be entitled to *only* those delay damages specifically approved and paid by Whiting Turner and/or Georgia Tech.

4.      The Agreement, at Attachment A, Section 3 and 7, is enforceable under Ohio law and does not violate Ohio Revised Code §4113.62(C)(2).  This statute declares that any provision of a construction subcontract that "waives or precludes liability for the delay during the course of a construction subcontract when the cause of the delay is a proximate result of the owner's or contractor's act or failure to act, or that waives any other remedy" is void and unenforceable as against public policy.

The Agreement between TolTest and Acme does not waive or preclude liability for delay, it merely limits Acme's ability to recover for delay to those claims submitted in writing and approved by Whiting Turner.  In *Dugan & Meyers Constr. Co., Inc. v. Ohio Dept. of Adm. Servs.*, 113 Ohio St.3d 226, 864 N.E.2d 68 (2007) [**Attachment I**],  the Ohio Supreme Court upheld the enforceability of a "no-damages-for-delay clause" which made a timely request for an extension of the project-completion deadline the exclusive remedy for delays caused by plan changes.  The *Dugan* court enforced a provision where the remedy was limited to a deadline extensions and allowed *no* monetary recovery at all.  The Acme/TolTest Agreement is less restrictive as it actually allows for monetary delay damages that are submitted in writing and approved by Whiting-Turner.  See also

*B.I. Chipping Co. v. R.F. Scurlock Co.*, No. 04AP-1219, 2005-Ohio-6748, 2005 WL 3484306 (Ohio App. 10 Dist. 2005), portions of subcontract limiting recovery of delay damages to amounts recovered by contractor from ODOT were enforceable [**Attachment II**].

5. Acme has failed to demonstrate delay damages with a reasonable degree of certainty. Under Ohio law, an injured party cannot recover damages for breach of contract beyond the amount that is established by the evidence with reasonable certainty, and generally, courts have required greater certainty in the proof of damages for breach of contract than in tort. *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.* (1996), 115 Ohio App.3d 137, 684 N.E.2d 1261; *Kinetico, Inc. v. Independent Ohio Nail Co.* (1984), 19 Ohio App.3d 26, 19 OBR 92, 482 N.E.2d 1345, citing Restatement of the Law 2d, Contracts (1981) 144, Section 352.

6. Acme has failed to demonstrate entitlement to overhead damages due to construction delay under the Eichleay formula as required under Ohio law. *Complete Gen. Constr. Co. v. Ohio Dept. of Transp.,* (2002), 94 Ohio St.3d 54, 760 N.E.2d 364. [**Attachment III**].

7. TolTest is entitled to a set-off $8,431.37 from any damages award for costs to remove the underground utilities that Acme failed to remove as required by Subcontract 11000-01. The parties have stipulated that this work fell under Acme's scope, that Acme failed to perform the duties as required under the contract and that TolTest incurred $8,431.37 in costs to complete the scope for Acme.

8. Acme is entitled to payment for the additional work it proves that it performed on a T&M basis under a theory of quantum meruit.

9. Acme is not entitled to $2,310,648.14 on the basis of that sum becoming an Account Stated under Michigan law. There is no evidence of an account for $2,310,648.14 or that TolTest assented to owing Acme this sum. *Keywell & Rosenfeld v. Bithell,* 254 Mich.App. 300, 331, 657 N.W.2d 759 (2002). [**Attachment IV**]

## MOTIONS IN LIMINE

Defendants do not intend to file motions in limine.  All matters of dispute regarding matters previously raised with the court have been resolved with Counsel for Plaintiff.  Defendants will raise objections to individual documents or particular testimony during trial should the need arise.

## OBJECTIONS TO EXHIBITS

Defendants and Counsel for Plaintiff have submitted to joint exhibits and as such, Defendants have no objections at this time.

      Respectfully submitted,

      RICHARD M. KERGER (0015864)
      KIMBERLY A. CONKLIN (0074726)

      By:  /s/ Kimberly A. Conklin
      Kerger & Associates
      33 S. Michigan St., Suite 100
      Toledo, Ohio 43604
      Telephone: (419) 255-5990
      Fax: (419) 255-5997
      Email: rkerger@kergerkerger.com

      William J. Lamping, Esq. (P- 30785)
      VESTEVICH, MALLENDER, DUBOIS
        & DRITSAS. P.C.
      6905 Telegraph Road, Suite 300
      Bloomfield Hills, Michigan 48301
      Telephone: (248) 642-1920
      Fax: (248) 642-2095
      Email: wlamping@vmddlaw.com

      Counsel for Defendants

## **CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing has been electronically filed this 7th day of March 2008. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system and in accordance with local rules and the Federal Rules of Civil Procedure.

/s/ Kimberly A. Conklin