IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ACME CONTRACTING, LTD.,

       Plaintiff,

v.

TOLTEST, INC., and BERKLEY REGIONAL INSURANCE COMPANY,

       Defendants.

Case No. 2:07-cv-10950

Hon. Sean F. Cox

_____/

| | |
|---|---|
| J. Christian Hauser (P57990)<br>FRASCO CAPONIGRO<br>WINEMAN & SCHEIBLE, PLLC<br>Attorneys for Plaintiff<br>1668 Telegraph Road, Suite 200<br>Bloomfield Hills, MI 48302<br>(248) 334-6767 / (248) 334-0999 FAX<br>ch@frascap.com | Richard M. Kerger (Ohio #0015864)<br>Kimberly A. Conklin (Ohio #0074726)<br>KERGER & ASSOCIATES<br>Attorneys for Defendants<br>33 S. Michigan Street, Suite 100<br>Toledo, OH 43604<br>(419) 255-5990 / (419) 255-5997 FAX<br>rkerger@kergerkerger.com<br><br>William J. Lamping (P30785)<br>VESTEVICH, MALLENDER, DUBOIS & DRITSAS, P.C.<br>Attorneys for Defendants<br>6905 Telegraph Road, Suite 300<br>Bloomfield Hills, MI 48301-3160<br>(248) 642-1920 / (248) 642-2095 FAX<br>wlamping@vmddlaw.com |

_____/

**PLAINTIFF ACME CONTRACTING, LTD.'S**
**<u>TRIAL BRIEF</u>**

     Plaintiff ACME Contracting, Ltd., ("ACME") through its attorneys, Frasco Caponigro Wineman & Scheible, PLLC, states for its Trial Brief as follows:

## I.   INTRODUCTION

ACME has brought suit against Defendants TolTest, Inc. ("TolTest") and Berkley Regional Insurance Company ("Berkley") seeking payment in excess of $2,800,000.00 based on TolTest's breach of contract (Complaint, Count II). ACME alternatively is entitled to payment under theories of quantum meruit (Complaint, Count III) and account stated (Complaint, Count IV). In the event TolTest is unable to satisfy any debt owed to ACME, Berkley is obligated to pay ACME under the terms of the Payment Bond (Complaint, Count I).

In its lawsuit ACME is seeking payment in the amount of $454,615.07 for work it performed under Trade Contract 11000-01. Additionally, ACME is entitled to $399,371.85 for additional work performed on a T&M basis. As a result of TolTest's interferences and mismanagement, ACME incurred additional damages in the amount of $1,110,620.00. Finally, ACME is entitled to damages in excess of $850,000.00 as a result of the loss profits, interest on the carrying costs for this debt, interest on its line of credit, pre-judgment interest and attorneys fees as a result of TolTest's breach of contract.

## II.   STATEMENT OF FACTS

### A.   THE PROJECT

This dispute arises out of the demolition and subsequent site work of the Electronics Research Building ("ERB") and Neely Research Reactor ("Neely Reactor") located at the Georgia Tech Nanotechnology Research Center in Atlanta, Georgia (the "Project").

### B.   THE PARTIES

ACME is a contractor engaged in commercial and industrial demolition, excavation and underground site work.

TolTest is an international contractor engaged in environmental remediation, design, management and engineering in the construction industry.

Berkley provided Payment Bonds Nos. 104043 and 0115196 on behalf of TolTest.

The Whiting-Turner Contracting Company ("W-T") served as the general contractor for the Project.[1]

### C.   NATURE OF THE DISPUTE

ACME and TolTest worked together to bid on two components ("Demolition" and "Earthwork") of the Project. The parties do not dispute that a contract was entered into for the Demolition component (Trade Contract 11000-01), or that no contract was executed for the Earthwork portion (Trade Contract 11000-04). For purposes of this Brief, ACME will address these two components separately.

#### 1.   Trade Contract 11000-01

On or about April 14, 2006, W-T and TolTest entered into Trade Contract 11000-01 in the amount of $2,112,430.00 wherein TolTest agreed to perform certain environmental abatement and demolition work at the Project.

ACME subsequently entered into a Subcontract Agreement ("Agreement") with TolTest in the amount of $1,050,018.00. (Joint Exhibit List, 31). ACME was responsible for the demolition and limited site work of the ERB and Neely Reactor, while TolTest would perform the abatement of asbestos, inventoried waste, PCBs and all lead based paint on the structures in question in advance of ACME. (Joint Exhibit List, 44). TolTest was also contractually responsible for the construction and maintenance of the environmental enclosures required for the abatement pursuant to state and federal laws. (Id.).

---

[1] Attached as Exhibit 1 is a contract organizational flow-chart identifying the contractual privity between the parties.

Pursuant to the schedule contained in the W-T / TolTest contract, all demolition activity was to be completed within approximately seventy-one (71) days. (Joint Exhibit List, 44). Likewise the TolTest May 8, 2006 Project Schedule directed ACME to complete all of its demolition activity within sixty-seven (67) days. (Joint Exhibit List, 147).[2]

The TolTest Work Plan, as well as the May 8, 2006 Project Schedule prepared by TolTest required ACME to begin demolition on the ERB, and then proceed to the dismantling of the Neely Reactor once TolTest had completed the asbestos abatement of the structures. Both demolition activities were to run concurrently as provided for in the TolTest Work Plan and May 8, 2006 Project Schedule. The May 8, 2006 TolTest Project Schedule indicated TolTest would turn over the ERB to ACME on Friday, May 19, 2006, and that demolition on the ERB Building would commence on Monday, May 22, 2006, concluding twenty-four (24) days later.

However on May 19, 2006, a fire broke out in the ERB that required a complete building evacuation while dozens of fire crews extinguished the blaze. It was subsequently discovered that the source of the fire was a flashover of volatile mastic remover, coupled with TolTest's negligent failure to de-energize the electrical outlets in the second floor abatement area. Due to the fire in the ERB caused by TolTest's negligence, ACME was not directed to commence demolition of the ERB until June 3, 2006, sixteen (16) days later than scheduled. (Joint Exhibit List, 42).

ACME was to commence demolition of the Neely Research Reactor on May 24, 2006. However, TolTest was still performing work inside the Neely Reactor, specifically, asbestos abatement clearance monitoring, as late as June 21, 2006. ACME's work was further delayed for an additional three (3) weeks due to the fact TolTest failed to dismantle its scaffolding inside the

---

[2] Although the dates to commence demolition activities are different between the W-T schedule and the TolTest schedule, the time to perform these activities is essentially identical.

reactor. (Joint Exhibit List, 207), and while TolTest continued to best decide on what means of containment it would employ to comport with environmental regulations. However, TolTest did not even begin work on the reactor (the underside of the dome, specifically) until June 3, 2006. The methods TolTest employed to perform abatement of the structure were inadequate, and TolTest eventually painted over the last of the asbestos it was unable to remove in order to get clearance for the work.

On July 14, 2006 (***fifty-two days later than anticipated***), TolTest directed ACME to proceed with the demolition of the Neely Reactor. (Joint Exhibit List, 41). From July 14, 2006 through July 28, 2006, ACME dismantled the Neely Reactor dome and the overhead crane system of the Neely Reactor. During this entire component of the work, ACME was forced to deal with the presence of PCB containing paint, lead based paint, and conflicting personal protective equipment measures that were never anticipated in the contract specifications or bid documents. Based on the clear language of TolTest's Work Plan the abatement of these structures was the full responsibility of TolTest, however their failure to adhere to its contract caused a significant economical impact on ACME.

ACME commenced removal of the walls of the Neely Reactor on August 6, 2006. The environmental containment method utilized by TolTest however was too small and too low for ACME's equipment to work effectively. Further complicating matters was that due to the small dimensions of the segmented containment area, as well as the precarious and shoddy construction of the containment system erected by TolTest, the polyvinyl sheeting would routinely droop and develop holes, impeding the use of the hydraulic shear within the structure.[3]

---

[3] As part of the demolition process and to conform with the applicable environmental regulations, the exterior of the Neely Reactor was required to be completely contained to insure there was no discharge of hazardous materials into the environment.

(Joint Exhibit List, 207). Additionally, due to the lack of properly designed ventilation of the containment area by TolTest, the interior workspace reached temperatures of 160 degrees Fahrenheit, an unsafe temperature for crews and machinery to work. What was originally expected to take 20 days ultimately took 49 days as a result of TolTest's interferences.

Despite the deficiencies in TolTest's work identified above, ACME cleared the steel from the concrete face of the reactor. After releasing the area to TolTest for abatement, ACME was further delayed by TolTest's inability to perform abatement of the exposed asbestos. The mastic remover used for the effort was required to be soy based as a result of the fire in the ERB associated with the prior type of mastic remover. After failing to perform the abatement despite utilizing three times the resources originally called for in TolTest's Work Plan, TolTest replaced its management team for the project. The replacement team erected a containment over the entire reactor, (an effort which took two additional weeks) and requested that ACME perform demolition of the entire structure without abatement. ACME did this, and all of the debris created was treated as asbestos containing waste. The only management task left to TolTest (coordinated removal of the asbestos waste) was not competently performed, and the project dragged out an additional ten days as a result.

    **2.**    **Trade Contract 11000-04**

W-T and TolTest had further discussions to expand TolTest's scope of work to perform the Earthwork once the ERB and Neely Reactor had been completely demolished. TolTest intended to subcontract the Earthwork to ACME and requested ACME submit a proposal to complete this work, which it did. (Joint Exhibit List, 2 and 3).

TolTest and W-T ultimately entered into Trade Contract 11000-04 wherein TolTest agreed to perform the Earthwork (Joint Exhibit List, 15). TolTest agreed to perform the

Earthwork, despite the fact the scope of work contained in Trade Contract 11000-04 was *considerably greater* than the scope of work bid on by ACME. When TolTest refused to acknowledge the increased scope of work and compensate ACME for the additional work not contemplated in its proposal, ACME justifiably walked away from the negotiations.

As a result of TolTest being unable to self-perform Trade Contract 11000-04, W-T declared TolTest to be in default. (Joint Exhibit List, 11). With the threat of termination looming over its head, TolTest directed ACME to perform the Earthwork on a time and materials basis ("T&M") in order to complete the work and avoid being terminated from the Project (Joint Exhibit List, 199). ACME performed the Earthwork on a T&M basis as directed by TolTest, incurring significant costs and expenses that have yet to be acknowledged or paid by TolTest.

### III. ARGUMENT AND ANALYSIS

#### A. TOLTEST HAS COMMITTED A BREACH BY FAILING TO PAY ACME PURSUANT TO PARAGRAPH 8 OF THE AGREEMENT

Paragraph 8 of the Agreement states in part:

> PAYMENT. For services rendered, TolTest agrees to pay SUBCONTRACTOR (ACME) as specified herein…TolTest will diligently pursue payment of SUBCONTRACTOR's (ACME) invoices by its CLIENT (W-T) and ***TolTest shall, within ten (10) days after receipt of such payment make payment to SUBCONTRACTOR (ACME)***. (Emphasis added).

Based on the contract language above, there can be no question that TolTest, within ten (10) days of receiving payment from W-T, is required to pay ACME.

Similarly, there can be no question that TolTest has been paid for the work performed by ACME under Trade Contracts 11000-01 and 11000-04. ACME is in possession of several documents that conclusively demonstrate that TolTest has been paid by W-T, specifically, emails and letters between TolTest, its surety Berkley and W-T confirming that payment had been made

7

on both Trade Contracts 11000-01 and 11000-04. Although the correspondence speak for themselves, a sample of the content of these documents is provided below:

- *"We [W-T] would like to release payments to TolTest, however, due to the size of the potential claim we would like to have your consent prior to our release of payments."* Letter dated December 15, 2006 by Michael Chlopek of W-T to David Alleman of TolTest. (Joint Exhibit List, 201).

- *"It is Berkley's understanding that W-T would like to make payment to TolTest for work performed under Trade Contracts 11000-04 and 11000-01. Although the ACME claims relate to both Trade Contracts 11000-04 and 11000-01, Berkley has no objections to W-T making payments to TolTest under both of these Trade Contracts."* Letter dated January 12, 2007 by Duane Smith of Berkley to Michael Chlopek. (Joint Exhibit List, 200).

- *"It would be appreciated if you would let me know when WT has released payment."* Email dated January 12, 2007 by Robert J. Leduc of TolTest to Michael Chlopek. *"Checks will be released immediately."* Reply by Michael Chlopek dated January 12, 2007. (Joint Exhibit List, 202).

- *"WT has released all payments to TolTest."* Email dated March 13, 2007 by Michael Chlopek to Duane Smith. (Joint Exhibit List, 203).

Between December 21, 2006 and March 14, 2007, TolTest was paid $484,271.96 for Trade Contract 11000-01 and $574,889.75 for Trade Contract 11000-04. Meanwhile, ACME has not been paid for any of its work performed after July 25, 2006. From the onset TolTest has refused to pay ACME on the premise that the Agreement contains "pay-when-paid" language. This position was affirmed by TolTest's general counsel William E. Wenner in a letter dated December 4, 2006 wherein he states as follows:

> …ACME know[s] that the subcontract between TolTest and ACME is a "pay when paid" subcontract and that payment from TolTest's client, Whiting-Turner is predicated upon receipt by Whiting-Turner of original lien waivers from TolTest, ACME and all lower tier vendors and subcontractors. **The reason ACME has not received payment from TolTest is that TolTest has not received payment from Whiting-Turner**. (emphasis added). (Joint Exhibit List, 209).

TolTest has further refused to pay ACME on the basis that ACME has failed to submit original lien waivers from its (ACME's) subcontractors and vendors. Again, in his December 4, 2006 letter, Mr. Wenner writes:

> TolTest has not received payment from Whiting-Turner because ACME has not supplied TolTest with original lien waivers from its vendors and subcontractors.

Again, the above statement is not supported by the facts. ACME supplied both TolTest and W-T with original full unconditional waivers from its subcontractors and vendors repeatedly during the course of the Project. In fact on November 21, 2006, Robert J. Leduc, Vice-President of TolTest drafted an email advising his project manager as follows:

> **Lance, the original of the lien waivers from ACME are in. Unfortunately they were just sitting in Accounting.** They will be on their way to the jobsite, today. (Emphasis added) (Joint Exhibit List, 210).

The above email exemplifies TolTest's conduct throughout this entire dispute. On one hand, TolTest argues it has not paid ACME due to the fact ACME has not submitted lien waivers. *Meanwhile, TolTest's own Vice-President admits receiving the original lien waivers sixteen months ago!* Mr. Leduc's email confirms what ACME has been stating from the onset; to wit: that ACME has submitted all of the paperwork necessary to process and receive payment, however it has been TolTest's incompetence, bad faith and dilatory conduct that has resulted in TolTest wrongfully withholding payment to ACME.[4]

A breach of contract occurs when a party demonstrates the existence of a binding contract or agreement; the non-breaching party performed its contractual obligations; the other party failed to fulfill its contractual obligations without legal excuse; and the nonbreaching party

---

[4] It should further be pointed out that ACME has followed the same submittal process in the beginning of the job (when the payments were processed and disbursed) is the same as it was at the end of the job (when all payments were withheld).

suffered damages as a result of the breach. *Garofalo v. Chicago Title Ins. Co.*, 104 Ohio App.3d 95, 108, 661 N.E.2d 218, 226 (1995). Here, TolTest has breached the contract by failing to pay ACME pursuant to paragraph 8 of the Agreement. ACME performed its work which was approved and accepted by TolTest and W-T. TolTest has been paid by W-T, and ACME has submitted all of the lien waivers as required (Joint Exhibit List, 19, 23, 28, 151 and 152), however TolTest refuses to release payment. Occasioned on TolTest's breach, ACME is entitled to $454,615.07 which represents the balance due for the base contract work performed under Trade Contract 11000-01.

      **B.**     **ACME IS FURTHER ENTITLED TO PAYMENT FOR THE INORDINATE AND UNEXPECTED DELAYS AND DISRUPTIONS ENCOUNTERED DURING THE COURSE OF ITS WORK AS A DIRECT RESULT OF TOLTEST'S ACTIVE INTERFERENCE**

ACME is entitled to $1,110,620.00 as a result of the unanticipated costs it incurred associated with TolTest's failure to properly coordinate, manage and perform the work taking place in advance of ACME. It is anticipated that TolTest will argue that ACME is not entitled to additional compensation for any suspension, delay or acceleration under the Agreement, however "no damage for delay" clauses are not favored by courts and, as a result, are strictly construed in favor of the delayed party. *John E. Green Plumbing and Heating, Inc. v. Turner Construction Company*, 742 F.2d 965 (6th Cir.1984) *cert den* 471 U.S. 1102 (1985). (Exhibit 2). For example, the "no damage for delay" clause will not be enforced in the following situations:

    1.     The delay was caused by the active interference of the other contracting party;

    2.     The delay was of a kind not contemplated by the parties;

    3.     The delay amounted to an abandonment of the contract;

    4.     The delay was caused by the bad faith on the part of the other contracting party. See, *Phoenix Contractors, Inc. v. General Motors Corporation*, 135 Mich. App. 787; 355 N.W.2d 673 (1984).

Likewise Ohio also allows a contractor to recover delay damages despite a "no damages for delay" clause. Under O.R.C. §4113.62, "no damages for delay" clauses are unenforceable when the delay was caused by the contractor's "actions or inactions".[5] (Exhibit 3). With respect to the instant case, there are sufficient facts presented by ACME to demonstrate that the delay and disruption incurred by ACME was *never* contemplated when it entered into the Agreement with TolTest.

ACME's delay and disruption claim stem not from differing site conditions or defective plans, but rather from the performance conditions anticipated at the time of bidding compared to the performance conditions actually encountered during the term of the Project. The difference between a claim for pure delay and a claim for disruption is that the impact of disruption on the contractor's work is usually a loss in efficiency. Because of this distinguishing characteristic, a contractor is still entitled to receive disruption damages even in contracts that contain no-damage-for-delay-damages. See *John E. Green*, *supra*; *Lichter v. Mellon-Stuart Co.*, 305 F.2d 216 (3rd Cir. 1962).

There is no question that ACME was delayed in the performance of its work. In fact, TolTest repeatedly admits that they themselves were unable to maintain their own Project schedule. In fact TolTest was so far behind schedule that W-T issued a Notice of Default on both Trade Contracts 11000-01 and 11000-04. (Joint Exhibit List, 11 and 43). This is confirmed by Lance Parsons, TolTest's project manager:

---

[5] O.R.C. §4113.62(C)(2) states in part that "Any provision of a construction subcontract…that is made part of a construction subcontract…that waives or precludes liability for the delay during the course of a construction subcontract when the cause of the delay is a proximate result of the owner's or contractor's act or failure to act, or that waives any other remedy for a construction subcontract when the cause of delay is a proximate result of the owner's or contractor's act or failure to act, is void and unenforceable as against public policy."

> Q. At this time when Mr. Lint was apparently dissatisfied with Acme's progress to date, where was TolTest in their performance? Were they on schedule?
>
> A. No. That's why we were being thrown off, because we were ultimately the prime. ***No, we were not on schedule***. (Emphasis added) (Dep of Lance Parsons, p 36).

Ms. Cynthia Martin, TolTest's procurement manager, also confirmed in her deposition that TolTest was behind schedule. She testified as follows:

> Q. Okay. Is there a point in time where you recall speaking to Mr. Parsons more often than normal, I would say?
>
> A. Yes.
>
> Q. And what was that particular focus of time that you dealt with Mr. Parsons with more frequency?
>
> A. I would say it would be the latter – it was the latter part of August, going into September.
>
> Q. Okay. And what was the substance of those conversations that you were talking to Mr. Parsons about?
>
> A. ***Trying to get the project back on schedule***.
>
> Q. And what was your understanding of the status of the project at that time?
>
> A. ***It was behind schedule***. (Emphasis added) (Dep of Cynthia Martin, p 28).

More significantly, there is no question that TolTest, like ACME, has lost a massive amount of money on this Project. Again, Lance Parsons stated in his deposition:

> Q. You don't know or you're not aware of the cost (of the Project)?
>
> A. I don't pay that -- I've got a lot of work going on, so this right here is Brian's baby as Project Manager. He's the one to know. I look at the overall broad picture. I told you before, we are losing $800,000 (on the Project). I know the overall picture, but I don't know that part down there.

12

> Q. How do you know you are losing $800,000?
>
> A. Because I get the project tracking report for every month for the jobs. So I see the overall picture for every job, so I know the dogs and I know the jobs making money. (Dep of Lance Parsons, pp 95-96).

ACME experienced delays that were totally unreasonable and never anticipated when it entered into the Agreement with TolTest. The schedules prepared by both W-T and TolTest provided ACME with approximately 67 days to complete its work. In reality, ACME did not complete its work until October 12, 2006, ***79 days later than anticipated***. Due to the nature of the work in question, ACME could not perform its work (demolition of buildings) until TolTest had fully completed its own work (abatement of the asbestos containing materials from those same buildings). The delays and disruptions encountered by ACME were all a direct result of TolTest's active interference and mismanagement throughout the life of the Project. As a result ACME is entitled to damages in the amount of $1,110,620.00 occasioned on the interference and mismanagement of TolTest.

    **C.    ACME IS ENTITLED TO ITS LOST PROFITS AS A RESULT OF THE INORDINATE AND UNEXPECTED DELAYS AND DISRUPTIONS ENCOUNTERED ON THE PROJECT**

The general rule is that lost profits may be recovered by the plaintiff in a breach of contract action if: profits were within the contemplation of the parties at the time the contract was made, the loss of profits is the probable result of the breach of contract, and the profits are not remote and speculative and may be shown with reasonable certainty. 30 Ohio Jurisprudence 3d (1983) 100, Damages, Section 90. See also, *Charles R. Combs Trucking, Inc. v. International Harvester Co.*, 12 Ohio St.3d 241, 244 (1984). (Exhibit 4).

The final prong of this rule is a bifurcated one. First, proof of the existence of damages must be established. Proof of the fact of damages in a lost profits case means proof that there would be some profit. Dunn, Recovery of Damages for Lost Profits 3d (1987), 8, Section 1.3. See also, *AGF, Inc. v. Great Lakes Heat Treating Co.*, 51 Ohio St.3d 177, 182 (1990) citing Dunn, Recovery of Damages for Lost Profit 3d (1987). Once the existence of damages has been determined, proof of the amount of damages must be ascertained. *Id*. Each prong requires the same degree of certainty. *AGF*, supra, 183, citing, *Gahanna v. Eastgate Properties, Inc.*, 36 Ohio St.3d 65 (1988).

In the instant matter ACME has incurred significant damages related to lost profits and loss of future business as a result of the breach of contract by TolTest. Occasioned on the above, ACME is entitled to be made whole, and is prepared to provide actual figures at trial that will prove these amounts with certainty.

### D. ACME IS ENTITLED TO PAYMENT UNDER A THEORY OF QUANTUM MERUIT FOR THE T&M WORK PERFORMED OUTSIDE THE SCOPE OF TRADE CONTACT 11000-01

To recover under the equitable theory of quantum meruit, ACME must show: (1) the receipt of a benefit by the defendant from the plaintiff; and (2) which benefit it is inequitable that the defendant retain. *Hollowell v. Career Decisions, Inc.*, 100 Mich. App. 561, 570; 298 N.W.2d 915 (1980). An unjust enrichment claim is not one in express contract, but it is one in implied contract. *Belle Isle Grill Corp. v. City of Detroit*, 256 Mich. App. 463; 666 N.W.2d 271 (2003).

In the instant matter, ACME seeks payment in the amount of $399,371.85 for the T&M work it performed that was outside the scope of the Agreement. TolTest *concedes* that ACME is entitled to compensation for the T&M work it performed outside the boundary of the Agreement, but to prevail ACME has the burden of demonstrating with particularity the amount of the

benefit retained by TolTest. (Doc. 34, TolTest Brief in Support of its Motion for Summary Judgement, p 7). ACME has previously provided to TolTest, and is again providing (Joint Exhibit List, 66), the value of the T&M work performed, and therefore is entitled to payment in the amount of $399,371.85 under a theory of quantum meruit.

### E. ACME IS ENTITLED TO PAYMENT UNDER THE THEORY OF ACCOUNT STATED

An account stated means a "balance struck between the parties on a settlement; and where a plaintiff is able to show that the mutual dealings which have occurred between the parties have been adjusted, settled, and a balance struck, the law implies a promise to pay that balance." *Thomasma v. Carpenter,* 175 Mich. 428, 436; 141 NW 559 (1913). (Exhibit 5). To give an account the force of an "account stated" because of the silence of the party receiving it, the circumstances must justify an inference of assent as to its correctness. *Id.* at 436. As was explained by the Michigan Supreme Court in *Kaunitz v. Wheeler,* 344 Mich. 181, 185; 73 NW2d 263 (1955), quoting from *White v. Campbell,* 25 Mich. 463, 468 (1872):

> The conversion of an open account into an account stated, is an operation by which the parties assent to the sum as the correct balance due from one to the other; and whether this operation has been performed or not, in any instance, must depend upon the facts. That it had taken place, may appear by evidence of an express understanding, or of words and acts, and the necessary and proper inferences from that. When accomplished, it does not necessarily exclude all inquiry into the rectitude of the account.

TolTest agreed to pay TolTest consistent with the terms and conditions of the Agreement entered into between the parties. Additionally, TolTest directed ACME to perform T&M work and to utilize the unit prices contained in the Agreement. Any discrepancy between the amounts appears to be a fiction created entirely by TolTest to avoid payment as the price to perform the work that was agreed to by both parties.

It is sufficient to constitute an account stated claim if the items constituting an account are settled upon so that nothing remains but a mere matter of computation. *Wood v. O'Callaghan*, 140 Mich. 598; 104 N.W. 36 (1905). Furthermore, one of the parties to a transaction is not precluded from claiming an account stated as to undisputed items of an account by the fact that there are also some disputed items in it. *Adams v. Noel*, 233 Mich. 594; 207 N.W. 817 (1926). As such ACME is not barred from recovering on its account stated claim simply because TolTest alleges that certain items may not be due and owing. The fact is TolTest assented to the balance due and owing ACME by making prior payments consistent with the terms and conditions of the Agreement.

More importantly, the Court should pay particular attention to the fact that absent from Mr. Wenner's December 4, 2006 correspondence (Joint Exhibit List, 209) is any objection to the amount being requested by ACME. Rather the entire basis for not paying ACME was premised on the conditional payment language, and the alleged failure to provide lien waivers. Both of those issues having been resolved, an account has clearly been stated. If there was an objection with the amount ACME was requesting, it certainly did not arise until the commencement of this lawsuit.

## IV.  CONCLUSION

Based on the above, Plaintiff ACME Contracting, Ltd. respectfully prays for a judgment in its favor and against Defendants TolTest and Berkley, jointly and severally, in the amount of $2,839,606.92.

Respectfully submitted,

_____

                                              J. Christian Hauser (P57990)
                                              FRASCO CAPONIGRO
                                              WINEMAN & SCHEIBLE, PLLC
                                              Attorney for Plaintiff
                                              1668 Telegraph Road, Suite 200
                                              Bloomfield Hills, MI  48302
Dated:  March 6, 2008                      (248) 334-6767