# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| ACME Contracting, Ltd. | ) | Case No.  2:07-CV-10950 |
| | ) | |
| Plaintiff, | ) | Hon. Sean F. Cox |
| | ) | |
| -vs- | ) | |
| | ) | |
| TolTest, Inc., et. al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS PROPOSED FINDINGS OF FACT
## & CONCLUSIONS OF LAW

Richard M. Kerger (Ohio #0015864)
Kimberly A. Conklin (Ohio #0074726)
KERGER & ASSOCIATES
33 S. Michigan St., Suite 100
Toledo, Ohio 43604
Telephone: (419) 255-5990
Fax: (419) 255-5997
Email: rkerger@kergerkerger.com

William J. Lamping (P-30785)
VESTEVICH, MALLENDER,
DUBOIS & DRITSAS, P.C.
6905 Telegraph Road, Suite 300
Bloomfield Hills, Michigan 48301-3160 Telephone: (248) 642-1920
Fax: (248) 642-2095
Email: wlamping@vmddlaw.com

Now come Defendants TolTest Inc and Berkeley Regional Insurance Company and submit the following Proposed Findings of Fact and Conclusions of Law.

## I.        PROPOSED FINDINGS OF FACT

### THE PARTIES

1.        TolTest, Inc. is a contractor engaged in environmental remediation, design, management, and engineering in the construction industry.    (**Stipulation ¶1.**)

2.        Acme Contracting, Inc. (hereinafter "Acme") is a contractor engaged in commercial and industrial demolition, excavation, and underground site work activities. (**Stipulation ¶2.**)

3.        Whiting-Turner Contracting Company (hereinafter "Whiting-Turner") is a construction manager based out of Atlanta, Georgia, which in January 2006 invited TolTest to bid on a multi-phased construction project at the Georgia Tech Nanotechnology Research Center in Atlanta, Georgia.    (**Stipulation ¶3.**)

4.        Berkley Regional Insurance Company is the surety on certain payment bonds issued to Whiting-Turner by TolTest in regards to the Georgia Tech project. (**Stipulation ¶4.**)

### THE CONTRACT

5.        In December and January 2006, TolTest, through its project manager Wayne Lint and Acme, through its employee Dave McDonald, collaborated to submit a bid to Whiting-Turner on the portion of the Georgia Tech project identified as "Subcontract No 11000-01: Demo/Abatement of : Neely Reactor, Electronics Research Building and Site." (**Stipulation ¶5; Joint Exhibit 44.**)

6.        The work plan was such that TolTest was to perform the hazardous materials abatement and Acme was to demolish the buildings and perform the related site groundwork. (**Stipulation ¶6; Joint Exhibit 27.**)

2

7.      Whiting-Turner awarded TolTest Subcontract No. 11000-01 and the final contract documents were executed on April 12, 2006.  **(Stipulation ¶7; Joint Exhibit 44, p. T-1.)**

8.      On June 9, 2006 Acme signed TolTest "Purchase Order P001652", which included Attachment A: "Subcontractor Services Agreement Terms and Conditions" and "Attachment B: Scope of Work". The Agreement expressly incorporated the terms of Whiting Turner's Subcontract No. 11000-01.  These documents comprised the entire agreement between the Acme and TolTest. **(Stipulation ¶9, Joint Exhibit 31.)**

9.      Under the Agreement, Acme was required to perform all labor, supervision, equipment and transportation to complete the Scope of Work referenced in Trade Contract 11000-01 with certain exceptions.  **(Stipulation ¶14; Joint Exhibits 31 & 44.)**

10.     With respect to the demolition of the Electronics Research Building, Acme was to complete all tasks in Paragraph B, except for items 1-8.  This section can be found on page T18-T19 of the Trade Contract 11000-01.  **(Stipulation ¶15; Joint Exhibits 31 & 44.)**

11.     With respect to the demolition of the Neely Reactor, Acme was to perform all tasks outlined in Paragraph B, items 8, 11-17.  This section can be found on page T16- T17 of the Trade Contract 11000-01.  **(Stipulation ¶16; Joint Exhibits 31 & 44.)**

12.     According to the Agreement, Attachment A, ¶12, the validity, interpretation and performance of the terms of the Agreement are to be governed and construed according to the laws of Ohio. **(Stipulation ¶18.)**

13.     According to the Agreement, Attachment A, ¶13, the Agreement constitutes the entire Agreement between TolTest and Acme and the terms cannot be altered, amended or appealed absent a duly executed written instrument. **(Stipulation ¶19.)**

<u>**DELAY CLAIMS**</u>

14.     The TolTest and Acme Agreement, Attachment A, ¶3 provides: "Schedule: The Work shall be performed according to the schedule outlined by TolTest, which may be modified per the instructions of the TolTest Project Manager." **(Joint Exhibit 31.)**

15.     The TolTest and Acme Agreement, Attachment A at ¶3 also provides: "Subcontractor (Acme) shall not be entitled to extra compensation for any suspension, delay, or acceleration not specifically allowed and paid to TolTest by its Client (Whiting Turner.)" **(Joint Exhibit 31.)**

16.     The Whiting Turner Contract at Article 4, "Diligent and Timely Performance" states, "Contractor shall immediately notify Construction Manager in writing of any interruption on the job or late delivery which causes or may cause a delay in Contractor's performance. No extension of the completion date shall be permitted unless approved in writing by the Construction Manager and Contractor shall be responsible for any losses or penalties incurred as result of delays in completing its work. Contract shall work overtime or shift work if deemed necessary, in the judgment of the Construction Manager to maintain progress of the work. Any such work or overtime shift work required to maintain progress or to complete the work on timely basis shall be Contractors expense and shall not be charged to Construction manager unless specifically authorized in writing by the Construction Manager prior to the commencement of such overtime work." **(Joint Exhibit 44, p. T-2.)**

17.     The Whiting Turner Contract at Article 4(b), "Diligent and Timely Performance" also states: "Construction Manager shall have the right at any time to delay or suspend the work or any part thereof without incurring liability therefore.  An extension of time shall be the sole and exclusive remedy of Contractor for any such delays or suspensions, but only the extent that a time extension is obtained from the Owner. In the event that the Contractor obtains additional

4

compensation from the Owner or others for delay or interference, Contractor shall be entitled to share pro rata in such additional compensation as determined in the good faith judgment of the Construction Manager. **(Joint Exhibit 44, p. T-3.)**

18.     The Whiting Turner Contract, at Article 6(a), "Changes in the Work", requires that any changes to the work be memorialized in a "Change Order", in writing and on a form approved by Whiting-Turner. **(Joint Exhibit 44, p. T-3)**

19.     The Whiting Turner Contract, at Article 6(e), in the event of a dispute about the work, change orders or claims for additional compensation, the Contractor shall have seven days to provide notice of such a claim in writing. **(Joint Exhibit 44, p. T-4.)**

20.     The Whiting Turner Contract, at Exhibit B, Scope of Work, General Conditions, Section X states: "This contractor understands that this is a fast-track project and during the execution of the work, the site will be congested with many other trades.  The subcontractor should not assume that construction can be carried out in a continuous, uninterrupted manner." **(Joint Exhibit 44, p. T-10.)**

21.     No specific Project Schedule is attached to or incorporated by reference into the terms of the Whiting Turner Subcontract or the Acme/TolTest Agreement.  **(Joint Exhibits 31 & 44.)**

22.     The Whiting Turner Contract at Article 4, "Diligent and Timely Performance" requires that TolTest adhere to schedules that the Construction Manager (Whiting-Turner) shall submit from time to time.  The Contract does not set forth a specific period of performance or include a schedule of any kind. **(Joint Exhibit 44, T-2-T-3.)**

23.     The Whiting Turner Contract at Exhibit B, Scope of Work, Section C, "Schedule" , paragraph 8, provides that: "No claims will be accepted for costs incurred to delays caused by others except to the extent that such delays exceed four months." **(Joint Exhibit 44, p. T21.)**

24.     The Whiting Turner Contract at Exhibit B, Scope of Work, Section C, "Schedule", provides a contract schedule based on a contract award and release date of February 24, 2006. The contract was not signed until April 12, 2006, 47 days later than the proposed release date. The schedule in Section C was not updated and Whiting Turner issued no subsequent schedule to TolTest.  **(Joint Exhibit 44, p. T1 & T21.)**

25.     The Agreement between Acme and TolTest defined Acme's period of performance as May 30, 2006 to August 30, 2006 or 93 contract days **(Stipulation ¶10; Joint Exhibit 31.)**

26.     According to its own work reports submitted daily on the job site, Acme was actually on the project from May 31, 2006 through October 11, 2006, a total of 135 days. Acme testified that it was on the site before May 31, 2006 but no work reports confirm this testimony. **(Joint Exhibits 68-71.)**

27.     TolTest mobilized to the Georgia Tech site on April 17, 2006, three days after it signed the contract with Whiting-Turner, and began its abatement work in the ERB shortly thereafter.  **(Stipulation ¶8, Joint Exhibit 44.)**

28.     On May 10, TolTest sent Acme, via email a document with the heading:  "Georgia Tech Reactor Progress as of May 8, 2006" in which planned start dates for various project tasks are shown.   According to this document, the then plan was for Acme to start demolishing the ERB on May 19.  (Joint Exhibit 216.)

29.     On May 12, 2006, a fire broke out in the ERB caused by damaged or faulty electrical equipment.  **(Joint Exhibit 35, p. 4.)**

30.     Wayne Lint, TolTest Project Manager, testified that the fire caused a one day work stoppage and then required approximately two days of clean up.

31.     Acme mobilized to the project site in Atlanta on May 30, 2006 and commenced work on May 31, 2006.  **(Joint Exhibit 68.)**

32.     Acme submitted its final bid on the project on May 22, 2006.  **(Joint Exhibit 39.)**

33.     Acme signed the Agreement on June 9, 2006 agreeing to May 30 as the start date for its performance. **(Stipulation ¶10; Joint Exhibit 31.)**

34.     Acme did not submit a request for pricing or a change order request stating a claim for delay based on the May 30, 2006 start date or the occurrence of the May 12, 2006 fire.

35.     On June 13, 2006, Acme sent TolTest a "GA Tech Revised Schedule" depicting updated dates for the project. The email makes no mention of claims for delay or objections to the current status of the project. **(Joint Exhibit 77.)**

36.     On June 23, 2006 Acme submitted a change order request for $141,076.81 to TolTest premised on seven days of delay from June 9 through June 16, caused by Georgia Tech's (the client) refusal to sign a Demolition Disposal Waste Profile. **(Joint Exhibit 46.)**

37.     According to Acme's work reports, Acme had 7 to 10 workers on site each day from June 9 through June 16 and on every one of those days, every worker logged in 10 hours of work per day.  **(Joint Exhibit 68.)**

38.     Acme was not on "standby" on from June 9- June 16.

39.     On June 26, 2006 Wayne Lint sent Dave McDonald an email stating that according to the Whiting-Turner contract, no delay time could be charged unless Whiting-Turner received payment from Georgia Tech.  Mr. Lint indicated that he would discuss the issue with Ryan Smith of Whiting Turner. **(Joint Exhibit 81.)**

40.     Wayne Lint testified that he presented Acme's request for pricing regarding the waste profile to Whiting Turner and Whiting Turner denied it.

41.     There is no evidence on the record that Acme's Change Order Request No. 4 regarding the waste profile was signed or approved by either Whiting Turner or TolTest.  **(Joint Exhibit 46.)**

42.     There is no provision in the TolTest and Acme Agreement that makes TolTest responsible for obtaining waste profiles for Acme. **(Joint Exhibit 31.)**

43.     There is no record of any attempt by Acme, after the June 23, 2006 submission of Change Order No. 4 regarding the waste profile, to continue to seek the approval of the request or to object to the denial of the request.  No further discussion appears on the record at all.

44.     Dave McDonald from Acme, who signed the Change Order Request No. 4 regarding the waste profile, attended the Whiting-Turner Progress Meeting on June 21, 2006 and there is no mention of the request having been raised in the "Meeting Minutes" under the section "Review of Outstanding Change Order Requests".  **(Joint Exhibit 186.)**

45.     On July 11, 2006, Dave McDonald wrote an email to Mike Bates stating that TolTest has delayed Acme 12 days by preventing Acme from cutting the Neely Dome. **(Joint Exhibit 183.)**

46.     The next day, July 12, 2006, Mike Bates sent an email to Dave McDonald and Wayne Lint of TolTest at 3:45 pm, explaining that the power in the reactor had not been shut off until July 11 and there was now a concern over lead based paint on the reactor dome.  Therefore, Bates says, this is causing a delay in cutting the reactor dome. **(Joint Exhibit 83.)**

47.     At 4:10 pm Wayne Lint responded to both Bates and McDonald and asked if Acme intended to file a claim for delay.   **(Joint Exhibit 84.)**

48.     At 4:33 pm Wayne Lint sent a second email to both Bates and McDonald explaining that Acme had failed to identify the cut lines on the dome as agreed upon until July 8, 2006. Therefore, the earliest TolTest could get to the torch work on the lines was July 10, 2006. Lint contends that Acme could not have been prepared to start demolishing the Neely Dome until July 13, 2006. Lint also points out that the concern over lead based paint would not have been an issue if Acme had stuck to its original plan to demolish the Neely dome. **(Joint Exhibit 83.)**

49.     There is no record Mr. McDonald or Mr. Bates responding to Mr. Lint's rebuttal regarding the delay issues.

50.     At 4:38 pm, Dave McDonald responds to Mr. Lint's question regarding the delay claim and says "In a word NO At this time, Acme wishes only to identify the delays, timetable, and reasons for. That way, if Whiting-Turner continues to hammer the field staff, we've got some reasoning to potentially give them."   **(Joint Exhibit 84.)**

51.     There is no record of Mike Bates responding to either of Mr. Lint's emails.

52.     TolTest turned over the Neely Reactor to Acme for demolition on July 14, 2007. **(Joint Exhibit 69.)**

53.     Acme did not submit a written change order request, request for pricing or any other form of request for delay damages related to TolTest's turn-over of the Neely Reactor on July 14, 2006.

54.     There is no signed approval from TolTest, Whiting-Turner or Georgia Tech related to delay compensation regarding TolTest's turn-over of the Neely Reactor on July 14, 2006.

55.     According to Acme's July work reports, Acme had only three of four "operators" on site from July 5 through July 31. There were no supervisors or laborers whereas Acme had employed anywhere from seven to ten workers, to include supervisors and laborers, on site the entire month of June. **(Joint Exhibit 69.)**

56.     Dave McDonald and Mike Bates, who had supervised much of Acme's work in June 2006, were absent from the site the entire month of July 2006. **(Joint Exhibits 68 & 69.)**

57.     On July 6, 2006 McDonald and Bates attended a meeting in Jackson County Michigan to address the State of Michigan's June 22nd termination of Acme from a project at the Jackson County Landfill. **(Joint Exhibits 109, 111, & 112.)**

58.     Mike Bates and Dave McDonald continued to be involved with the Jackson County matter through at least July 19, 2006 when they attended a site walk on the Jackson County project. **(Joint Exhibit 115.)**

59.     Acme did not increase its labor force at the Georgia Tech site when TolTest turned the Neely Reactor over to over to Acme on July 14. **(Joint Exhibit 69.)**

60.     According to Acme's work reports, Acme performed work every day it was on the Project with the exception of one day, July 18, when Acme stopped work because of concerns that the Neely Dome contained PCB's.  **(Joint Exhibits 68, 69, 70 & 71.)**

61.     Acme did not submit a written change order request, request for pricing or any other form of request for delay damages related to the testing of the Neely Dome for PCB's.

62.     There is no signed approval from TolTest, Whiting-Turner or Georgia Tech related to delay compensation regarding the testing of the Neely Dome for PCB's.

63.     On July 21, 2006, in an email between TolTest and Acme, TolTest informed Acme that Whiting-Turner wanted the wash vaults installed as soon as possible, work that Acme was responsible to perform.  **(Joint Exhibit 92.)**

64.     TolTest also indicated that Whiting Turner was fine with the demolition of the Neely Reactor going over time, but wanted a recovery schedule. **(Joint Exhibit 92.)**

65.     On July 26, 2006, Whiting-Turner issued TolTest a Notice of Default for Subcontract 11000-01 stating: "TolTest has an obligation to diligently perform its scope of work and provide a sufficient workforce to accomplish such work. Clearly for the last two weeks, this has not happened." **(Joint Exhibit 43.)**

66.     Wayne Lint testified that the Whiting Turner Notice of Default was the direct result of Acme's lack of progress on the project and the insufficient work force on site.

67.     On August 7, 2006, TolTest issued Acme a "Notice of Default" for failing to diligently perform its scope of work.  **(Joint Exhibit 17.)**

68.     On August 10, TolTest sent Acme an email declaring that Acme needed to address deficiencies with "protection of existing trees and vegetation" and that Acme needed to remove demolition debris and topsoil on the site as required by the contract.  **(Joint Exhibit 102.)**

69.     On August 11, 2006, Dave McDonald of Acme sent an email to Wayne Lint of TolTest to report that it could not effectively perform work in the west containment structure over the Neely reactor due to the small size of the structure and because of the heat within.  In addition, Acme set forth a list of prior delays on the job site to include: 1) access to the ERB from May 30th to June 3rd , 2) access to the Neely Reactor from June 30th to July 14th and 3) construction problems with the Neely containment structure from August 2nd to the 5th.   The email stated that Acme was currently assessing project costs associated with these delays. (**Joint Exhibit 103.**)

70.     On August 12, 2006, TolTest sent Acme a lengthy response regarding the claimed delays citing numerous facts to support TolTest's position that any delay Acme had experienced was not caused by TolTest but by Acme's change of means and methods of demolition, the discovery of lead based paint, Acme's failure to man the site with the appropriate amount of workers and Acme's numerous equipment failures.  TolTest also pointed out that Acme at all times relevant had numerous outstanding tasks to perform such as the wash values, utilities demolition and the parking lot demolition.  (**Joint Exhibit 103.**)

71.     There is no record of Acme submitting a written change order request related to the claims made in the August 11 email.

72.     There is no signed approval from TolTest, Whiting-Turner or Georgia Tech related to the claims made in the August 11 email.

73.     On August 13, TolTest sent Acme an email with a revised schedule to address the fact that Acme had still not completed the installation of the wash vaults, the grading of the ERB or the removal of the ERB parking lot.  TolTest also informed Acme that it needed to beef up its street cleaning duties to comply with its obligations under the contract.  **(Joint Exhibit 120).**

74.     On August 15, 2006, Whiting Turner emailed TolTest about erosion control deficiencies on the job site and Acme's failure to employ measures recommended by Whiting Turner.  TolTest forwarded the email to Acme and Acme responded by acknowledging the deficiencies and assuring TolTest it would take action to employ sufficient erosion controls.  **(Joint Exhibit 129).**

75.     On August 25, 2006 Whiting Turner issued a Retraction of Default letter to TolTest for Subcontract 11000-01.  **(Joint Exhibit 18.)**

76.     On September 28, 2008, Acme sent TolTest an email stating that it was being delayed on the project because TolTest was not removing asbestos related materials from the site at a sufficient rate.   Acme stated that is was tabulating charges for future claims against the project. TolTest responds indicating that Acme still has remaining scope of work that it could be performing.  **(Joint Exhibit 168.)**

77.     There is no record of Acme submitting a written change order request related to the claims made in the September 28 email.

78.     There is no signed approval from TolTest, Whiting-Turner or Georgia Tech related to the claims made in the September 28 email.

79.     Acme's scope of work under the Agreement included the following: Identify all utilities under the new building footprint and demo completely regardless of depth.  **(Stipulation ¶20.)**

80.     After Acme demobilized from the site on October 11, TolTest discovered underground utilities during excavation activities to include piping and wire under the new building footprint. **(Stipulation ¶21.)**

81.     TolTest self-performed the removal of the remaining utilities at a cost of $5,650.37. **(Stipulation ¶22.)**

82.     TolTest was required engage the services of a subcontractor to use ground penetrating radar over the entire site to ensure that all utilities had been now removed.  **(Stipulation ¶23.)**

**83.**     On January 2, 2007, Michael Bates of Acme submitted a "Request for Equitable Adjustment" to TolTest stating various claims for delay. Mr. Bates suggests that Acme is owed a total of $1,088,765.15 in delays broken down as follows:  $272,055.58 for delays associated with the demolition of the ERB, and $816,709.57 associated with delays during the demolition of the Neely Reactor. **(Joint Exhibit 214, p. 11.)**

**84.**     A trial Acme submitted three documents summarizing its delay damages claim for the ERB ($272,055.69), Neely Reactor Dome Removal ($107,0913.50), and the Neely Reactor Demolition ($709,620.39) for a grand total of $1,088,717.58. **(Joint Exhibits 215 A, 215B and 215 C.)**

85.      The three delay damages summaries lists various dates and with a corresponding dollar amount.  Attached to each summary are numerous "Acme Contracting Ltd Cost Breakdown" forms, one for each day listed on the summary. A review of the "cost breakdowns" reveals that Acme is charging as "delay time" anywhere from 8 to 10 hours of delay for every worker it had on site for that particular day. It is also recording anywhere from 8 to 10 hours of equipment time for each piece of equipment it had on site. **(Joint Exhibits 215 A, 215B and 215 C.)**

86.     For every day listed in the summary except July 18, Acme work reports show that Acme did perform work for those days, was not on standby or shutdown and that it charged for that work under its various Subcontract 11000-01 payment applications. **(Joint Exhibits 68, 69 & 70.)**

87.     The cost breakdowns charge for equipment rate at a daily rate, not by the hour. **(Joint Exhibits 215 A, 215B and 215 C.)**

88.     The Whiting Turner Contract sets equipment rates by the hour, day, week and month. **(Joint Exhibit 44, Pages T-39-1.)**

89.     The rate Acme uses in its "cost breakdown" is nearly double the contract rate. **(Joint Exhibits 215 A, 215B and 215 C.)**

90.     There is no record of Acme submitting a written change order requests for delay compensation for $1,088,717.58.

91.     There is no signed approval from TolTest, Whiting-Turner or Georgia Tech for delay compensation for $1,088,717.58.

92.     There is no record of Acme submitting a written change order requests for delay compensation for 1,088,765.15.

93.     There is no signed approval from TolTest, Whiting-Turner or Georgia Tech for delay compensation for $1,088,765.15.

94.     Acme presented no documentary evidence at trial regarding a line of credit it had to take out due to delays on the project.

95.     There is no record of Acme submitting a written change order requests regarding a line of credit it had to take out due to delays on the project. .

96.     There is no signed approval from TolTest, Whiting-Turner or Georgia Tech for delay compensation regarding a line of credit Acme had to take out due to delays on the project.
 .

97.     In his January 2, 2006 "Request for Equitable Adjustment", Mike Bates seeks payment for 95 days "office overhead" for a total of $294, 6945.65.  **(Joint Exhibit 214, Attachment 3.)**

98.     There is no record of Acme submitting a written change order requests for "office overhead" of $294, 6945.65.

99.     There is no signed approval from TolTest, Whiting-Turner or Georgia Tech for compensation for "office overhead" of $294, 6945.65.

100.     Acme presented no documentary evidence at trial to support the list of expenses set forth in the summary attached to the Request for Equitable Adjustment.

<u>PAYMENT FOR SUBCONTRACT 11000-01</u>

101.     According to the Agreement, the base amount TolTest would pay Acme was $1,010,018.00. **(Stipulation ¶11.)**

102.     The Agreement set terms for payment at Attachment A, ¶8.  Specifically, TolTest agreed to compensate Acme "as specified herein".  Moreover, all invoices must be "supported by documentation that may be required by the Client (Whiting-Turner)" and "all invoices must reference the Purchase Order Number, Job Number, include an invoice number and completed and executed lien waivers to be process for payment.  Incomplete invoices will be rejected and returned to the Subcontractor (Acme.)" **(Stipulation ¶17.)**

103.     As a condition precedent to payment, Article 5 of Whiting Turner Contract states that Whiting Turner may require lien waivers from all subcontractors are provided in a form satisfactory to Whiting Turner. **(Joint Exhibit 44, p. T-3.)**

104.     To date, TolTest has paid Acme $595,402.93, for work performed through August 31, 2006 as reflected in payments made under Acme's applications 1 through 4. **(Stipulation ¶12.)**

105.     TolTest rejected Acme's payment applications 5-7. **(Stipulation ¶13.)**

106.    During the project TolTest issued ten contract modifications or "change orders" under Subcontract 11000-01. **(Joint Exhibit 36.)**

107.    Acme does not object to TolTest's Change Order 1 (+$3,810) and Change Order 3 (-$450). **(Joint Exhibit 218.)**

108.    TolTest Change Order 2 was a deduction of $13,300 based on a reduction in Acme's scope of work related to the removal of asbestos containing material from the site.  **(Joint Exhibit 219.)**

109.    Acme does not deny that the scope was reduced, but states that the appropriate deduction should be $9,323.72 as reflected by a "voluntary deduction" in Acme Payment Application 7. **(Joint Exhibits 218 & 142, p. 4.)**

110.    There is no documentation supporting the $9,323.72 "voluntary deduction" on the record other than the referenced payment application.

111.    On August 27, 2006, Dave McDonald expressly agreed to the $13,300 deduction for ACM removal. **(Joint Exhibit 107.)**

112.    Change Order 4 relates to a $302.94 phone bill Acme was responsible to pay but did not.  TolTest paid the bill and issued the change order. Acme states that it paid the bill but there is no evidence of payment on the record.  **(Joint Exhibits 36, 218 & 219.)**

113.    TolTest's Change Order 5 was cancelled out by Change Order 6 and is therefore not an issue. **(Joint Exhibits 36 & 219.)**

114.    TolTest's Change Order 7 is a deduction for a $1,000 safety violation related to "Reactor warning fence not properly installed after repeated warnings from WT" **(Joint Exhibit 36.)**

115.    The TolTest/Acme Agreement at Attachment A, Section 4, final paragraph states: "If SUBCONTRACTOR (Acme) is cited for violations of government regulations and TolTest is

16

also cited due to such allegations, TolTest may hold funds in the amount of the proposed fines in addition to any retention being held and deduct actual fines required to be paid by TolTest from final payment to the SUBCONTRACTOR (Acme)." **(Joint Exhibit 31.)**

116.   Acme does not deny that the penalty was assessed, but states that TolTest agreed to take over responsibility for site work and erosion controls. **(Joint Exhibit 218.)**

117.   There is no signed written agreement on the record indicating that TolTest agreed to take over responsibility for site work and erosion controls.

118.   Change Order 8 is a deduction for $17,022.32 related to "rabbit tube work". **(Joint Exhibits 36, 218 & 219.)**

119.   Acme acknowledges the change in scope that necessitated Change Order 7 but disputes the amount. **(Joint Exhibit 218.)**

120.   Dave McDonald of Acme provided the $17,022.32 figure to TolTest on September 7, 2006. **(Joint Exhibit 158.)**

121.   Change Order 9 is the deduction of $44, 200 for scope of work changes initiated by Whiting Turner.   Whiting Turner deleted line items 9-14 from the scope of work and TolTest sought input from Acme on the amount to deduct. **(Joint Exhibits 36 & 219.)**

122.   Acme agrees the scope was reduced, but at trial presented evidence that the amount it provided to TolTest was actually $39,200.00, a difference of $5,000. **(Joint Exhibit 218.)**

123.   However, in his January 2, 2007 "Request for Equitable Adjustment" sent to TolTest, Mr. Bates acknowledged that $44,200 was a proper deduction for "Restoration". **(Joint Exhibit 214, pg. 10.)**

124.   Change Order 10 was a deduction of $8,000 for the reduction of scope of work changes initiated by Whiting Turner related to the elimination of shoring work and the reduction of

$25,463 based on Acme's failure to complete its scope of work in accordance with the contract. Specifications. **(Joint Exhibit 36.)**

125.    Acme's pay applications 5 through 7 do not take into account the Change Order's issued by TolTest to include the Change Orders that Acme does not dispute.  **(Joint Exhibits 140, 141, & 142).**

126.    Payment Application 5, which covers work through 9/30/2006, does not account for TolTest Change Orders 1 - 4 even though Acme does not dispute TolTest Change Orders 1 and 3.  **(Joint Exhibit 140, page 4; Joint Exhibit 218.)**

127.    The only Change Orders acknowledged on Payment Application 5 are Acme's Change Orders approved by Wayne Lint. **(Joint Exhibit 140, page 4; Joint Exhibits 51, 52, 55.)**

128.    Payment Application 5 also includes a $9,000 wash vault credit for which TolTest has no record of, or approved change order for.  **(Joint Exhibit 140, p. 4.)**

129.    Payment Application 6, which covers work through 10/24/06, does not account for TolTest Change Orders 1, 2, 4, 7, 8 or 9.  Payment application 6 does acknowledge TolTest Change Order 3. **(Joint Exhibit 141, p. 4.)**

130.    Payment Application 6 also includes four itemized "voluntary deducts" for which there are no corresponding change orders, signed or unsigned.  (**Joint Exhibit 141, p.4.)**

131.    The lien waiver submitted by Acme for Payment Application 6, is not on the proper Whiting Turner form. **(Joint Exhibit 141.)**

132.    Payment Application 7, which covers work through 10/24/2006 does not account for TolTest Change Orders 1, 2, 4, 7, 8, or 9. Payment application 7 does acknowledge TolTest Change Order 3. **(Joint Exhibit 142, p.4.)**

133.    Payment Application 7 also includes four itemized "voluntary deducts" for which there are no corresponding change orders, signed or unsigned.  **(Joint Exhibit 142, p. 4.)**

134.    There is no lien waiver signed by Acme attached to Payment Application 7 nor is there any corresponding lien waiver anywhere on the record. **(Joint Exhibit 142, p. 4.)**

135.    Based on the above deficiencies with Payment Applications 5-7, Acme failed to meet the conditions precedent to payment under the Agreement and TolTest was acting under its authority under the contract to reject the payment applications.

136.    In his "Request for Equitable Adjustment" to TolTest, Michael Bates of Acme claims Acme is owed $44,655.33 in "additional work modifications" regarding Acme's scope of work under Subcontract 11000-1. **(Joint Exhibit, 214, p.10.)**

137.    There is no record of Acme submitting a written change order request related to the $44,655.33 in "additional work modifications" nor is there evidence that TolTest, Whiting-Turner or Georgia Tech agreed to such modifications.

138.    In his "Request for Equitable Adjustment" to TolTest, Michael Bates of Acme claims Acme is owed $136,676 associated with "loss of efficiencies" regarding the changed soil compaction rate. **(Joint Exhibit, 214, p.11.)**

139.    This work regarding soil compaction rates is associated with the grading of the ERB, work that falls under the scope of Subcontract 11000-01. **(Joint Exhibit 44, p. T-17-18.)**

140.    There is no record of Acme submitting a written change order request for $136,676.00  associated with "loss of efficiencies" regarding the changed soil compaction rate nor is there evidence that TolTest, Whiting-Turner or Georgia Tech agreed to such modifications.

141.    TolTest's does not dispute that upon resolution of all outstanding claims, Acme is entitled to $352,309.00 for Subcontract 11000-01.  This amount equals the contract price modified by TolTest Change Orders 1-10 and Acme Change Orders 1-3 and less the amount already paid to Acme.

### TIME AND MATERIAL CHARGES

142.     On or about April 6, 2006, Whiting-Turner invited TolTest to bid on a separate groundwork, grading, and shoring phase of the Georgia Tech project: Grading and Shoring, Subcontract Number 11000-04. **(Stipulation ¶ 24, Joint Exhibit 14.)**

143.     Both Wayne Lint of TolTest and Dave McDonald of Acme testified that Subcontract 11000-04 related to "site work" or grading and shorting of an area of the project known as "Sector 1." This area was separate and apart from the ERB and the Neely Reactor, the areas of the project covered under Subcontract 11000-01. **(Joint Exhibit 213.)**

144.     TolTest and Acme again collaborated on bidding this second phase. **(Stipulation ¶25.)**

145.     Acme submitted a bid to TolTest to perform the work under this second phase. **(Stipulation ¶ 26; Joint Exhibit 13.)**

146.     On July 11, 2006, Whiting Turner awarded TolTest Subcontract Number 11000-04 for "Grading and Site Utilities". **(Stipulation ¶ 27; Joint Exhibit 15.)**

147.     On July 27 at 9:30am Dave McDonald sent an email to Wayne Lint and asked him the status of the "grading" purchase order. Later that afternoon, Mr. Lint responded that he was working on it and then asked if "there is a reason we can't utilize the T&M rates just in case I can't get this pushed through tomorrow?"    Mr. McDonald indicated he would need to check with Mike Bates.  In response,  Mr. Lint indicated that he was fine with Acme proceeding with "section 1" work on the basis of T&M rates, but that he would need to know what equipment Acme would be using. No further response appears on the record. **(Joint Exhibit 118.)**

148.     On July 27, 2006, before the purchase order had been signed or agreed to, ACME commenced work under Subcontract Number 11000-04 on a time and materials basis utilizing the unit prices found in the Subcontract Number 11000-01.  **(Stipulation ¶ 29.)**

149.     Acme's hourly labor rates for the project are specified under Whiting Turner Trade Contract 11000-01 at Exhibit I, page T-34 through T 35-5. Acme's equipment rates for the project are specified under Whiting Turner Trade Contract 11000-01 at Exhibit I, page T-39-1. **(Stipulation ¶ 30.)**

150.     Acme's daily report for July 27, 2006 indicates that Acme had four operators on site and that they worked a combined 44 hours for the day.   The work performed for the day indicates that Acme "cut and remove top of Neely reactor and removed crane, remove top soil from area 1." The work report does not indicate the number of hours spent on the Neely Reactor as opposed to the hours spent on Sector 1.   The work report makes no mention of equipment used. **(Joint Exhibit 69.)**

151.     Acme's daily report for July 28 does not indicate that Acme performed any work on Sector 1 for that day. **(Joint Exhibit 69.)**

152.     Acme's daily report for July 29 does not indicate that Acme performed any work on Sector 1 for that day. **(Joint Exhibit 69.)**

153.     Acme's daily report for July 31, 2006 indicates that Acme had four operators on site and that they worked a combined 44 hours for the day.   The work performed for the day indicates that Acme "Removed top soil on Ferst streets, cut on Neely Reactor."  The work report does not indicate the number of hours spent on the Neely Reactor as opposed to the hours spent on Sector 1. The work report makes no mention of equipment used. **(Joint Exhibit 69.)**

154.     Acme's daily report for August 1, 2006 indicates that Acme had four operators on site and that they worked a combined 44 hours.   The report states that Acme "Graded up topsoil on northwest side of Sector 1, Performed sloping of south ERB excavation, cut radius sections of the Neely Reactor and peeled back with hydraulic excavator."  The report does not indicate the number of hours spent on the Neely Reactor and the ERB sloping as opposed to the hours spent on

Sector 1.   The work report indicates Cat 330 was used for 11 and Cat 345 was used for 10 hours. The report does not indicate which piece of equipment was used on Sector 1 work. **(Joint Exhibit 70.)**

155.    On August 2, 2006, TolTest sent Acme a purchase order to Acme for work to be performed under Subcontract Number 11000-04. **(Stipulation ¶ 28; Joint Exhibit 13.)**

156.    Acme's work report for August 2 indicates that Acme performed the following work on Sector 1: "6:30 am to 8:30am, Removed unsuitable organic soils from Sector 1 and stockpiled", 10am to 5:30 am: Elevation surveying of Sector 1" and "11am to 6pm: Graded and compacted Sector 1".  The report indicates that Acme had six workers on site and each worked 12 hours, but the report does not indicate which of the workers performed the Sector 1 work.  The work report indicates Cat 330 and Cat 345 were on site but the hours are unchanged from the August 1 report. The report indicates that the Cat 345 was inoperable for 5 hours.   The report does not indicate which piece of equipment was used on Sector 1 work. **(Joint Exhibit 70.)**

157.    Acme's work report for August 3 indicates that Acme performed the following work on Sector 1: "9am to 10am, Due to excessive moisture, plough up sector 1 soils for drying" and "1pm to 6pm: Resume grading and compacting Sector 1." The report indicates that Acme had 6 workers on site and each worked 12 hours, but the report does not indicate which of the workers performed the Sector 1 work.  The work report indicates Cat 330 and Cat 345 were on site but the hours are unchanged from the August 1 report. The report does not indicate which piece of equipment was used on Sector 1 work. **(Joint Exhibit 70.)**

158.    Acme's work report for August 4 indicates that Acme performed the following work on Sector 1: "10am to 11am, Ploughed Sector 1 soils due to last nite rain event."  The report indicates that Acme had 6 workers on site and each worked 12 hours, but the report does not indicate which of the workers performed the Sector 1 work.  The work report indicates Cat 330 and

Cat 345 were on site but the hours are unchanged from the August 1 report. The report does not indicate which piece of equipment was used on Sector 1 work. **(Joint Exhibit 70.)**

159.    There is no record of an Acme work report for August 5. The TolTest work report does not indicate that Acme worked on Sector 1 on August 5. **(Joint Exhibit 70.)**

160.    Acme was not on site on August 6. **(Joint Exhibit 70.)**

161.    Acme's work report for August 7 indicates that Acme performed the following work on Sector 1: "Draft and stockpiled material into Sector 1; Continue grading and compacting both ERB footprint and Sector 1."   The report does not indicate the specific times spent on Sector 1. The report indicates that Acme had 6 workers on site and each worked 11 hours, but the report does not indicate which of the workers performed the Sector 1 work.  The work report indicates Cat 330 and Cat 345 were on site but the hours are unchanged from the August 1 report. The report does not indicate which piece of equipment was used on Sector 1 work. **(Joint Exhibit 70.)**

162.    On August 8, 2006, TolTest's General Counsel sent Mike Bates of Acme a letter of Default regarding Acme's refusal to enter into and Agreement regarding Subcontract 11000-04. In this letter, TolTest states: "Acme's decision not to honor its bid and its refusal to enter into a subcontract agreement with TolTest in accordance with the terms of its bid leaves TolTest no alternative but to perform the Project utilizing whatever methods available to TolTest." **(Joint Exhibit 9.)**

163.    The August 8, 2006 letter from TolTest to Acme put Acme on notice that TolTest would be assuming responsibility for Sector 1 work.

164.    The TolTest report for August 7 indicates that Acme spent a "total time of 1 operator for 3 hours working Section 1." **(Joint Exhibit 70.)**

165.    Acme's work report for August 8 reports no Sector 1 work and no other subsequent reports indicate Sector 1 work. **(Joint Exhibit 70.)**

166.     TolTest mobilized crews out of its Oden, Indiana location to self perform Subcontract 11000-04. **(Stipulation ¶ 32.)**

167.     Wayne Lint testified that at this time, TolTest's role on the project took on a predominately "site work" focus as opposed to just materials abatement. For this reason, Lance Parsons, the general manager of TolTest self performance division, was made Project manager for the project.

168.     There is no evidence in the record that Wayne Lint was removed for cause from the Georgia Tech Project. Mr. Lint remains to this day a TolTest employee.

169.     Due to the incomplete nature of the work reports, it is unclear how many man hours or equipment hours Acme expended on Sector 1. **(Joint Exhibits 69-70.)**

170.     Dave McDonald testified that Acme handed TolTest signed time and materials tickets to TolTest on a Daily basis. Wayne Lint testified that he never received the tickets and no time and materials tickets appear on the record. He also denied seeing any of the daily T&M sheets during his visits to  the TolTest trailer  in July and August.  While Wayne Lint was only on the job site for a few days in July, no one who worked for Acme and who was on the Georgia Tech job site in July testified at trial. There was no evidence of the submission of time and material tickets beyond Mr. McDonald's testimony based on what he merely assumed took place.

171.     The Whiting Turner Contract required time and materials tickets to be signed by the contractor**.  (Joint Exhibit 44, p. T-3-6-c.)**

172.     On November 21, 2006, Dave McDonald sent Tim Tidwell of Whiting-Turner an "itemized summary of charges as it relates to site work performed at the Project in question. While the parties were negotiating the terms and condition of the site work, (which ultimately failed), Acme was directed to commence site work, as well as back filling and compaction under the

different 98% standard on a time and materials basis. This work was ordered in July 2006 by Wayne

Lint, TolTest project manager at the time**". (Joint Exhibits 20 & 136.)**

173.    Mr. McDonald's statement in the Whiting Turner letter that TolTest ordered Acme

to perform back filling and compaction under the different 98% standard on a time and materials

basis is not supported by any evidence on the record.  There is no change order request or approval

related to T&M work for any scope of work under Subcontract 11000-01.  Nor is there any email or

other correspondence that would memorialize such an agreement.

174.    The TolTest and Acme contract requires that changes in the scope of the work be in

writing.  (**Joint Exhibit 44 T-3 (6)(c) and T-4 (6)(e).)**

175.    The July 27 email from Wayne Lint to Dave McDonald refers only to T&M work

under Subcontract 11000-04 or Sector 1.  **(Joint Exhibit 118.)**

176.    Attached to the November 21 letter was a "GA Tech T&M Grading Summary" that

purported to summarize daily T&M charges from July 5 through August 27 totaling $395,722.  Also

attached were Acme work reports from August 2, 3, 4 and 7th.  Work reports from July 5- August 1

and August 8 to August 27 are not attached.  **(Joint Exhibits 20 & 136.)**

177.    In another version of the "GA Tech T&M Grading Summary" Acme claims

entitlement to $399,371.85.   Attached to this version are 40 documents titled "Acme Contracting,

Ltd. Cost Breakdown", with each corresponding to a date listed on the summary.  **(Joint Exhibit**

**66.)**

178.     According to the attached cost breakdowns, Acme reports performing grading and

excavation on the ERB, Subcontract 11000-01 scope of work,  on the following days:  July 5, 6, 7, 8,

10, 11-15, 17-18 and August 8-12, 19-27. **(Joint Exhibits 66 &  44, pg. T-16 - T 19)**

179.    According to the attached cost breakdowns, Acme reports performing work on

Sector 1, Contract 11000-04 scope of work, on the following days: July 27-August 8 and August 14-

18. On most of these days, Acme also reports performing work on the ERB and/or the Neely Reactor but the cost breakdowns do not separate the hours spent on each individual task. (**Joint Exhibit 66.)**

180.   The "cost breakdowns" conflict with the work reported on Acme's daily reports. (Joint Exhibits 69 and 70).

181.   According to the work reports, the only days Acme performed work on Sector 1 was July 27, 31 and August 1, 2, 3, 4 and 7.

182.   The work reports, created on the day the work was actually performed, are more credible than the cost breakdowns.

183.   Michael Bates and Dave McDonald indicated in their trial testimony that they sent the "T&M Summary" with daily cost breakdowns to TolTest in Maumee, Ohio.

184.   There is no documentation on the record to support the testimony that Acme sent the T&M summary or underlying charges for T&M work to TolTest before it sent those charges Whiting Turner on November 21, 2006 or before the January 2, 2006 "Request for Equitable Adjustment."   Nor did any witness for TolTest testify at trial or through deposition that he or she ever received such documents, other than Wayne Lint who said he did not believe he had seen the summaries until the winter of 2006-07.

185.   On December 6, 2006, Cindy Martin of TolTest notified Jackie Bates of Acme that "Whiting Turner had recently informed TolTest that Acme was claiming entitlement to $395,722 in time and materials charges" and that the claims were being investigated.   Ms. Martin goes on to indicate that no payments of any kind will be forthcoming until the time and materials claim was resolved and until the issue of missing lien waivers was resolved to Whiting Turner's satisfaction. **(Joint Exhibit 182.)**

186.    On January 2, 2007, Michael Bates sent a "Request for Equitable Adjustment" to Robert Leduc of TolTest stating: "From July 5, 2006 through August 27, 2006 Acme performed removal, grading, backfill and compaction of materials at the ERB, as well as grading Sector One (the work performed on a time and materials basis)."   Mr. Bates goes on to state that "based on the above, and as supported by the attached documentation, Acme requests an upward adjustment to its contract price in the amount of $399, 371.85,  $262,695.49 of which constitutes the level of effort for grading Sectors 1 and 2." **(Joint Exhibit 214.)**

187.    According to the terms of the TolTest Acme Agreement, Acme would not entitled to charge on a time and materials basis for Subcontract 11000-01 scope of work without a signed change order or amendment to the contract.

188.    There is no record of a change order request or any other written request from Acme for $399, 371.85 or $262,695.49 in time and materials charges nor is there signed approval from TolTest, Whiting Turner or Georgia Tech related to such request request.

189.    Attorneys for TolTest and Acme took over all discussions regarding the disputes between the parties as indicated in an email of January 3, 2007 from William Wenner, General Counsel for TolTest to Dave McDonald of Acme. **(Joint Exhibit 183.)**

190.    Acme never submitted an invoice, payment application or demand for $2,310,648.14.

191.    Mr. Bates' January 2, 2007 letter to Mr. Leduc seeks payment of $1,911,778.60

192.    There is no evidence of an account for $2,310,648.14.

## II.      PROPOSED CONCLUSIONS OF LAW

### BREACH OF CONTRACT

1.      The relationship between Acme and TolTest, with respect to Acme's work performed under Subcontract 11000-01 is controlled by the terms of the parties' Agreement executed on June 9, 2006 as well as the terms of TolTest's contract with Whiting-Turner, which was made a binding part of the Acme and TolTest Agreement by express reference.

2.      Under Ohio law, to establish a breach of contract a plaintiff must demonstrate by a preponderance of the evidence: (1) that a contract existed; (2) that the plaintiff fulfilled its obligations; (3) that the defendant failed to fulfill its obligations; and (4) that damages resulted from this failure. *Lawrence v. Lorain Cty. Community College*, 127 Ohio App.3d 547, 548-549, 713 N.E.2d 478 (1998).

3.      When confronted with an issue of contractual interpretation, the role of a court is to give effect to the intent of the parties to the agreement.  *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 273, 714 N.E.2d 898 (1999), citing *Emps.' Liab. Assur. Corp. v. Roehm* , 99 Ohio St. 343, 124 N.E. 223 (1919), syllabus. See, also, Section 28, Article II, Ohio Constitution.

4.      Courts examine the contract as a whole and presume that the intent of the parties is reflected in the language used.  *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130, 509 N.E.2d 411(1987), paragraph one of the syllabus.

5.      When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties. *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146 (1978), paragraph two of the syllabus

6.      Express contracts are not subject to "equitable adjustment". *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146 (1978), paragraph two of the syllabus

7.      TolTest did not breach its Agreement with Acme by rejecting Acme's pay applications five, six and seven or Acme's request for "equitable adjustment" since Acme did not meet the conditions precedent to payment.  Under the Agreement, TolTest had the right to reject payment applications and invoices that did not comply with the contract terms.

8.      Upon resolution of all outstanding claims and the submission of a final lien wavier, TolTest owes Acme $352,309.00 as final payment for Subcontract 11000-01.  This amount equals the contract price modified by TolTest Change Orders 1-10 and Acme Change Orders 1-3 and less the amount already paid to Acme.

### DELAY DAMAGES

9.      The Acme and TolTest Agreement, Attachment A, Sections 3 and 7, unambiguously provides that Acme is not entitled to any delay damages that were not requested in writing and allowed and paid by Whiting-Turner.   **(Joint Exhibit 31.)** *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130, 509 N.E.2d 411(1987), paragraph one of the syllabus.

10.     The TolTest and Whiting Turner Contract, Article 4(b), "Diligent and Timely Performance" and Article 6(a), "Changes in the Work", unambiguously provides that Acme is not entitled to any delay damages not requested in writing, and approved by Whiting Turner and the client Georgia Tech. (**Joint Exhibit 44, p. T-3-4.**)

11.     Acme agreed to be bound by the terms of the Agreement it signed and to the Terms of the Whiting-Turner and TolTest Contract, failed to submit its request for delay damages or to obtain approval for delay compensation, and therefore is not entitled to any delay damages.

12.     The TolTest and Acme Agreement, at Attachment A, Section 3 and 7, is enforceable under Ohio law and does not violate Ohio Revised Code §4113.62(C)(2), which provides that any provision of a construction subcontract that "waives or precludes liability for the delay during the course of a construction subcontract when the cause of the delay is a proximate result of the owner's

or contractor's act or failure to act, or that waives any other remedy" is void and unenforceable as against public policy. The Agreement between TolTest and Acme does not waive or preclude liability for delay, it merely limits Acme's ability to recover for delay to those provision set forth in the Agreement. This provision is enforceable under Ohio law as set forth in *Dugan & Meyers Constr. Co., Inc. v. Ohio Dept. of Adm. Servs.***,** 113 Ohio St.3d 226, 864 N.E.2d 68 (2007) and *B.I. Chipping Co. v. R.F. Scurlock Co.*, No. 04AP-1219, 2005-Ohio-6748, 2005 WL 3484306 (Ohio App. 10 Dist. 2005).

13.     In addition to its failure to meet the contract requirements to collect damages for delay, Acme has failed to demonstrate delay damages with a reasonable degree of certainty. Under Ohio law, an injured party cannot recover damages for breach of contract beyond the amount that is established by the evidence with reasonable certainty, and generally, courts have required greater certainty in the proof of damages for breach of contract than in tort. *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.,* 115 Ohio App.3d 137, 684 N.E.2d 1261 (1996); *Kinetico, Inc. v. Independent Ohio Nail Co.*, 19 Ohio App.3d 26, 482 N.E.2d 1345 (1984), citing Restatement of the Law 2d, Contracts, 144 Section 352 (1981).

14.     Acme has also failed to demonstrate entitlement to overhead damages under the Eichleay formula as required under Ohio law. *Complete Gen. Constr. Co. v. Ohio Dept. of Transp.***,** 94 Ohio St.3d 54,760 N.E.2d 364 (2002). Acme has not demonstrated a period of "standby" and has not produced documentary evidence from which damages may be calculated to a reasonable degree of certainty.

## QUANTUM MERUIT

15.     The doctrine of quantum meruit allows a party to recover the reasonable value of services rendered." *Kamalnath v. Mercy Mem Hosp,* 194 Mich.App 543, 551; 487 NW2d 499 (1992).

16.    The theory underlying quantum meruit recovery is that the law will imply a contract in order to prevent unjust enrichment when one party inequitably receives and retains a benefit from another." *Morris Pumps v. Centerline Piping, Inc,* 273 Mich.App 187, 194; 729 NW2d 898 (2006).

17.    A party may not recover against another under a theory of quantum meruit if it entered into an express contract with that party, even if the parties disagreed regarding the terms of the contract. *Biagini v. Mocnik,* 369 Mich. 657, 659; 120 NW2d 827 (1963).

18.    A more accurate statement of the interplay between an express contract and unjust enrichment would be that "a contract cannot be implied in law while an express contract covering the same subject matter is in force between the parties." *HJ Tucker and Assoc., Inc. v. Allied Chucker and Engineering Co.,* 234 Mich.App. 550, 573, 595 N.W.2d 176 (1999); see also *Campbell v. City of Troy,* 42 Mich.App. 534, 537, 202 N.W.2d 547 (1972). This is a very long-standing rule. *Boughton v. Boughton's Estate,* 111 Mich. 26, 27-28, 69 N.W. 94 (1896); *Galloway v. Holmes,* 1 Doug 330, 337 (1844).

19.    Acme and TolTest entered into an express contract for Acme to perform certain scope of work under Whiting Turner Subcontract 11000-01: "Demo/Abatement of: Neely Reactor, Electronics Research Building and Site."   (Joint Exhibit 31)

20.    Due to the existence of this express contract, Acme is not entitled to recover under a theory of quantum meruit for any work it performed under the scope of Subcontract 11000-01 – the inverse of which being the only viable quantum merit claim is for work Acme performed **outside** the scope of the Subcontract 11000-01.

21.    Acme is not entitled to payment under the theory of quantum meruit for any of the grading and shoring work it performed at the ERB since this work falls under the scope of Subcontract 11000-01.

22.     Sector 1 was an area of the project that was to be graded and shored under a separate contract, Whiting Turner Subcontract 11000-04. Acme submitted a bid for Subcontract 11000-04 but ultimately did not sign an agreement to perform.

23.     Therefore, any work performed by Acme on Sector 1 is subject to a quantum meruit claim.

24.     Acme's work reports show that Acme work on Sector 1, in addition to other work due under Contract 11000-01, on seven days:  July 27, July 31, August 1-4 and August 5.  Acme would be entitled to be compensated under a theory of quantum meruit for these days but has failed to show how many actual man hours or equipment hours it expended on Sector 1 on those days. Therefore, Acme is not entitled to any payment under a theory of quantum meruit.

<u>**ACCOUNT STATED**</u>

25.     Acme is not entitled to $2,310,648.14 on the basis of that sum becoming an Account Stated under Michigan law. There is no evidence of an account for $2,310,648.14 or that TolTest assented to owing Acme this sum. *Keywell & Rosenfeld v. Bithell,* 254 Mich.App. 300, 331, 657 N.W.2d 759 (2002).


<u>**PREJUDGMENT INTEREST**</u>

26.     The award of prejudgment interest in the instant action is governed by Ohio law. *See Hale v. Life Ins. Co. of N. Am.,* 795 F.2d 22, 24 (6th Cir.1986) ("When a federal court's jurisdiction rests upon diversity, the award of prejudgment interest is governed by state law.").  The parties in this action agreed the contract would be determined by Ohio law.

27.     Under Ohio law, "when money becomes due and payable upon any ... instrument of writing ... and upon all judgments, decrees, and orders of any judicial tribunal for the payment of money arising out of tortious conduct or a contract or other transaction, the creditor is entitled to

interest at the rate per annum determined pursuant to section 5703.47 of the Revised Code...."

O.R.C. § 1343.03(A).

28.     The purpose of prejudgment interest is "to compensate the plaintiff for his inability

to use the money between the date the claim was due, and the date it was paid." *Hale,* 795 F.2d at 24;

*see also Oaker v. Farmers Ins. Co. of Columbus, Inc.,* 129 Ohio App.3d 277, 717 N.E.2d 778, 779 (Ohio

App.1998).

29.     TolTest never had a contract obligation to pay Acme for Pay Applications 5 through

7 since each of those payment applications were incorrectly submitted as previously set forth. Thus,

Acme is not entitled to prejudgment interest on outstanding amounts due under Subcontract 11000-

01.

Respectfully submitted,

RICHARD M. KERGER (0015864)
KIMBERLY A. CONKLIN (0074726)

By: _/s/ Kimberly A. Conklin_____
Kerger & Associates
33 S. Michigan St., Suite 100
Toledo, Ohio 43604
Telephone: (419) 255-5990
Fax: (419) 255-5997
Email: rkerger@kergerkerger.com

William J. Lamping, Esq. (P- 30785)
VESTEVICH, MALLENDER, DUBOIS
  & DRITSAS. P.C.
6905 Telegraph Road, Suite 300
Bloomfield Hills, Michigan 48301
Telephone: (248) 642-1920
Fax: (248) 642-2095
Email: wlamping@vmddlaw.com

Counsel for Defendants

<u>**CERTIFICATE OF SERVICE**</u>

      This is to certify that a copy of the foregoing has been electronically filed this 31st day of March 2008.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system and in accordance with local rules and the Federal Rules of Civil Procedure.

                           /s/ Kimberly A. Conklin