UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Acme Contracting, Ltd.,

      Plaintiff,

v.                                                         Case No. 07-10950

Toltest, Inc. *et al.*,                                    Honorable Sean F. Cox

      Defendants.

_____/

**OPINION**

    This action involves a dispute between a contractor, Defendant TolTest, Inc.

("Defendant" or "TolTest"), and its subcontractor, Plaintiff Acme Contracting, Ltd. ("Plaintiff"

or "Acme"), over work performed on a multi-phased construction project at the Georgia Tech

Nanotechnology Research Center in Atlanta, Georgia ("the Project").  Plaintiff's claims for

breach of contract, account stated, quantum meruit and claim on payment bond were tried to the

bench.  For the reasons that follow, which constitute the findings of fact and conclusions of law

required by FED. R. CIV. P. 52, the Court finds Defendants liable to Plaintiff for damages in the

amount of $2,025,330.65.

**Background**

    On February 1, 2007, Acme filed this action against Defendants Toltest and Berkley

Regional Insurance Company ("Berkley") in Livingston County Circuit Court.  The matter was

then removed to this Court based on diversity jurisdiction.[1]  Acme's Six-Count Complaint

---

[1]As both parties acknowledged in the Joint Pretrial Order, this Court has diversity
jurisdiction over this action pursuant to 28 U.S.C. § 1332.  (Joint Pretrial Order at 2).

asserted the following claims: "Claim on the Payment Bond" (Count I); "Breach of Contract" (Count II); "Quantum Meruit" (Count III); "Account Stated" (Count IV); "Fraud" (Count V); and "Innocent Misrepresentation" (Count VI).

Following discovery, the parties filed cross-motions for summary judgment. The Court ruled on those motions in an Opinion & Order dated January 28, 2008 (Docket Entry No. 45). The Court dismissed Plaintiff's fraud and innocent misrepresentation claims (Counts V and VI), but found that genuine issues of material fact existed as to the remaining claims.

A Joint Pretrial Order was filed on March 3, 2008 (Docket Entry No. 48). The case was tried to the bench over the following days: March 12, 2008, through March 14, 2008; March 17, 2008, through March 19, 2008; and on March 27, 2008.

### The Trial

A. <u>Exhibits:</u>

The parties presented the Court with a Joint Exhibit Book, containing Exhibits 1 through 219. All exhibits were admitted into evidence without objection. The exhibits presented to the Court, which were often used with the witnesses, included but were not limited to the contract documents, correspondence between the parties, photographs of work at the project, invoices, the schedule, work reports, pay applications, and change orders.

B. <u>Plaintiff's Witnesses:</u>

Plaintiff presented its proofs through two witnesses, David MacDonald ("MacDonald") and Michael Bates ("Bates").

MacDonald is the Director of Operations at Acme. MacDonald was intimately involved

with the project, from the outset of discussions with Toltest, through the bidding and contracting process, and through the completion of the project. MacDonald testified extensively regarding the communications and agreement between the parties, the work done by Acme and Toltest on the project, the schedule for the project and the sequence of work that was done at the project. The Court found MacDonald to be a credible witness.

Bates, Acme's second witness, is the Chief Executive Officer of Acme who started Acme in 1996. Like MacDonald, Bates was also intimately involved with the project from the beginning. Bates testified extensively regarding the communications and agreements between the parties, the work done by Acme and Toltest on the project, the schedule for the project and the sequence of work that was done at the project. Bates also testified extensively regarding Acme's invoices and pay applications and the damages incurred by Acme. The Court found Bates to be a highly credible witness.

At the close of Plaintiff's proofs, Defendants made a motion pursuant to FED. R. CIV. P. 52(c) for judgment on partial findings. The Court declined to render any judgment until the close of all the evidence. The parties stipulated on the record that the Court would set forth all of its factual findings and legal conclusions in this opinion.

C.    Defendants' Witnesses:

Toltest presented its case through one witness, Wayne Lint ("Lint").[2] Stated simply, Lint was not a credible witness. Lint's answers to questions were often vague and evasive. At times, his testimony contradicted his previous answers and in a few instances his answers defied

_____

[2]TolTest had originally anticipated calling Lance Parsons and/or Cindy Martin as witnesses, but ultimately decided not to call either of them as witnesses.

common sense.  Many times during his testimony, Lint could not recall rather significant events that occurred during the project.  In several instances, the Court was surprised to hear Lint, the Toltest representative charged with overseeing the project for a significant period of time, display what can only be described as a lack of familiarity with the work done, and events that occurred at, the project.  Because Lint was ultimately removed from the project, Lint has no knowledge of any events that occurred after August 11, 2006.

**Findings Of Fact**

After consideration of the facts stipulated by the parties and consideration of the testimony and exhibits presented at trial, drawing inferences as appropriate, weighing the evidence and assessing the credibility of the witnesses, the Court finds as follows.  For purposes of continuity, the Court also includes below the numerous facts that were stipulated to by the parties.[3]

The Parties:

TolTest is a contractor engaged in environmental remediation, design, management, and engineering in the construction industry.  (Stipulated Facts at ¶ 1).

Acme is a contractor engaged in commercial and industrial demolition, excavation, and underground site work activities. (Stipulated Facts at ¶ 2).

Whiting-Turner Contracting Company (hereinafter "Whiting-Turner") is a construction manager based out of Atlanta, Georgia, which in January 2006 invited TolTest to bid on a multi-phased construction project at the Georgia Tech Nanotechnology Research Center in Atlanta, Georgia.   (Stipulated Facts at ¶ 3).

---

[3]The stipulated facts will be identified as such below.

Berkley Regional Insurance Company is the surety on certain payment bonds issued to Whiting-Turner by TolTest in regards to the Georgia Tech project. (Stipulated Facts at ¶ 4).

The Prior Course Of Dealings Between Acme And Toltest:

Prior to the project at issue in this case, Acme and TolTest had worked together three or four times and had a good working relationship. The course of dealings between the parties was quite informal, in that Acme would start work, or perform additional work, without a written contract. For example, on a prior project at Northland Mall, Acme was hired to perform $10,000.00 of concrete removal. During the course of that project, however, TolTest asked Acme to perform what amounted to approximately $400,000.00 in additional work on that project, without the parties having signed a written contract and without TolTest having issued any kind of written order for that additional work. Nevertheless, Acme was fully paid for that work after submitting its time and materials invoices to TolTest.

The Intent Of The Parties And Formation Of The 01-Contract:

In January 2006, TolTest, through its project manager Lint and Acme, through its employee MacDonald, collaborated to submit a bid to Whiting- Turner on the portion of the Georgia Tech project identified as "Subcontract No 11000-01: Demo/Abatement of : Neely Reactor, Electronics Research Building and Site" ("the 01-Contract") (Stipulated Facts at ¶ 5).

The work plan was such that TolTest was to perform the hazardous materials abatement and Acme was to demolish the buildings and perform the related site groundwork. (Stipulated Facts at ¶ 6).

Acme does not perform asbestos abatement work, and had no responsibility for any asbestos abatement at the Project. Rather, TolTest was to perform all abatement work at the

Project.

Pursuant to the work plan prepared by Toltest, the parties' intent was that Acme would begin its portion of the work at the Project by commencing demolition of the Electronics Research Building and Site ("ERB") after TolTest had completed asbestos abatement of that structure. After the demolition of the ERB was completed by Acme, the plan was that Acme would then proceed to the Neely Reactor to remove the dome. TolTest, however, was also to be involved in the progression of the work in the Neely Reactor because it was to perform all necessary abatement of that structure. Once the dome had been removed, the plan was that Acme would strip off the steel exterior, to expose the concrete walls which would allow Toltest to come in and abate the asbestos-containing mastic in the walls. After the abatement of the cement walls had been completed by TolTest, Acme would then demolish the remaining portions of the Reactor. Then Acme was to bring both structure areas to a specified grade. After the areas were brought to grade, Acme would then remove the parking lot by the ERB and the asphalt lot surrounding the Reactor, remove the underground utilities and complete any last minor items before leaving the work site.

Thus, the parties agreed and understood that Acme's sequence of work at the Project would be highly dependent upon TolTest's performance of its abatement work.

Whiting-Turner awarded TolTest Subcontract No. 11000-01 and the final contract documents were executed by Whiting-Turner and TolTest on April 14, 2006. (Stipulated Facts at ¶ 7).

According to the contract documents, Acme was provided approximately 74 days to complete its portion of the work at the Project under the 01-Contract. (*See e.g.*, Exhibit 44 at T-

6

22).

Dealings Relating To The 04-Contract:

Meanwhile, on or about April 6, 2006, Whiting-Turner invited TolTest to bid on a separate groundwork, grading, and shoring phase of the Georgia Tech Project (Subcontract Number 11000-04).  (Stipulated Facts at ¶ 24).  TolTest and Acme again collaborated on bidding this second phase.  (Stipulated Facts at ¶ 25).  On or about May 22, 2006, Acme submitted a bid to TolTest for $1,517,349 to perform the work under this second phase.  (Stipulated Facts at ¶ 26).  Whiting Turner awarded TolTest Subcontract Number 11000-04 for "Grading and Site Utilities". (Stipulated Facts at ¶ 27).

TolTest sent Acme a purchase order to Acme for work to be performed under Subcontract Number 11000-04.  (Stipulated Facts at ¶ 28).  Acme did not sign that purchase order, however, because the ultimate contract that TolTest signed with Whiting-Turner, the "04-Contract," had expanded the work that Acme would perform but did not provide for any increased compensation to Acme for that work.

It is undisputed that TolTest and Acme were never able to arrive at an Agreement for work under Subcontract Number 11000-04 for "Grading and Site Utilities" and Acme never signed the purchase order. (Stipulated Facts at ¶ 31).

Acme Begins Performing, As Directed By TolTest, Before The 01-Contract Is Signed:

Acme, which is located in Michigan, had to transport its equipment to Georgia so that it could use that equipment to perform its work at the Project under the 01-Contract.  Due to the nature of the equipment (size, weight, etc.) that Acme would need for the Project, Acme had to dismantle certain equipment in order to transport it and had to undertake other measures such as

7

securing necessary travel permits.  Acme also had to transport its crews to Georgia.

Although TolTest and Acme had not yet signed a written contract, on April 17, 2006, TolTest issued Acme a Notice to Proceed, directing Acme to start mobilizing its resources for the Project.  The Notice to Proceed advised that the contract would be forwarded in the next five days.  (*See* Exhibit 74, 4/17/06 Notice to Proceed).  The contract, however, was not forwarded to Acme until June.

Nevertheless, in reliance on the notice to proceed from TolTest, Acme started mobilizing to the Georgia Tech site on April 17, 2006, as directed by TolTest.

On or about May 10, 2006, Lint forwarded to Acme the project schedule that TolTest had prepared (Exhibit 147).  Acme was responsible for line items 3, 12-15, 23, 24, 26, and 28-30 on the schedule, while TolTest was responsible for all other line items.

The project schedule prepared by TolTest and delivered to Acme by Lint became a binding part of the agreement between Acme and Toltest.  Acme was justified in relying on the dates in the schedule from TolTest in planning and estimating the manner in which Acme would perform its work.

At all relevant times, the work site at the Project was not congested.  TolTest was to perform its work in advance of Acme, and TolTest was the first contractor to begin work on the Project.  Thus, no other contractors were working before TolTest and could have impeded TolTest's performance.

TolTest's schedule indicated that Acme would commence work at the site on May 19, 2006, and would be completed on or before July 28, 2006.

<u>A Fire Caused By TolTest Delays Demolition Of The ERB By Acme:</u>

On May 12, 2006, TolTest's crew started a fire in the ERB while performing abatement work using mastic remover.  At this time, Acme was dismantling its equipment and preparing its trucks for the trip to Georgia.  Lint called MacDonald and advised there may be a slight delay due to the fire in the ERB.

The fire in the ERB, however, caused all abatement work on the site by Acme to stop. TolTest was unable to continue with its abatement work in the ERB until authorities inspected the building and determined that it was safe to continue that work.

TolTest did not finish its abatement work and turn the ERB over to Acme until June 3, 2006.  (*See* Exhibit 42).  Thus, the fire resulted in a 16 day delay to Acme because rather than being able to begin as scheduled on May 19th, Acme was not allowed to proceed with any demolition of the ERB until June 3rd.

<u>Acme Is Further Delayed In Demolition Of The ERB By The Waste Profile Issue:</u>

In addition, during Acme's demolition of the ERB it encountered additional delays.  By June 9, 2006, Acme had demolished the structure such that it was essentially "rubble" on the ground.  It was delayed in moving the waste material and construction debris off site, however, because the waste management company that was working on the project required "waste profile" signatures by the owner, Georgia Tech.  Acme provided the profiles to TolTest, who then gave the profiles to Whiting-Turner so that Whiting-Turner could get the owner to sign them.  No one from Georgia Tech, however, wanted to take responsibility by signing the profiles.

Ultimately, the waste management company agreed to waive the waste profile requirement, but the issue delayed Acme's work.  Acme submitted a requested change order for

the delay (Exhibit 56) on or about June 23, 2006.  Lint initially said he needed more detail, but later indicated sufficient detail had been provided, and that he would look into it.  (Exhibit 81).  No change order, however, was issued for the delay.

TolTest was required by the terms of the contract to assist Acme in securing the documentation for waste management debris. (*See, e.g.*, Exhibit 31 at Attachment B.)

TolTest was responsible for virtually of the delays that Acme encountered in performing its work relating to the ERB.

The delay that Acme experienced with respect to the work in the ERB was less than four months in duration.

The various delays that Acme encountered with respect to its work in the ERB caused Acme to incur additional costs totaling $272,005.58. (Exhibit 215A).  Of that amount, $141,076.81 was due to TolTest's failure to assist it in securing the documentation for the demolition debris.

The 01-Contract Is Executed By Acme And TolTest On June 12, 2006:

On June 12, 2006, the contract documents were finally executed as between Acme and TolTest.  At that time, Acme signed TolTest "Purchase Order P001652", which included Attachment A: "Subcontractor Services Agreement Terms and Conditions" and "Attachment B: Scope of Work" and incorporated the terms of Whiting Turner's Subcontract No. 11000-01.  These documents comprised the entire agreement between the Acme and TolTest.  (Stipulated Facts at ¶ 9).

Under the Agreement, Acme was required to perform all labor, supervision, equipment and transportation to complete the Scope of Work referenced in Trade Contract 11000-01 with

certain exceptions.  (Stipulated Facts at ¶ 14).  With respect to the demolition of the ERB, Acme was to complete all tasks in Paragraph B, except for items 1-8.  This section can be found on page T-18 of the Trade Contract 11000-01.  (Stipulated Facts at ¶ 15).  With respect to the demolition of the Neely Reactor, Acme was to perform all tasks outlined in Paragraph B, items 8, 11-17.  This section can be found on page T-17 of the Trade Contract 11000-01.  (Stipulated Facts at ¶ 16).

Under the Agreement, TolTest was obligated to commence, pursue and complete its work on the project in a diligent manner, in such sequence and according to schedule, so as to not delay any other contractors.  (Exhibit 46 at T-2).

According to the Agreement, Attachment A, ¶12, the validity, interpretation and performance of the terms of the Agreement are to be governed and construed according to the laws of Ohio. (Stipulated Facts at ¶ 18).  According to the Agreement, Attachment A, ¶13, the Agreement constitutes the entire Agreement between TolTest and Acme and the terms cannot be altered, amended or appealed absent a duly executed written instrument. (Stipulated Facts at ¶ 19).

Acme's scope of work under the Agreement included the following: Identify all utilities under the new building footprint and demo completely regardless of depth. (Stipulated Facts at ¶ 20)

The Agreement defined Acme's period of performance as May 30, 2006 to August 30, 2006.  (Stipulated Facts at ¶ 10).

According to the Agreement, the base amount TolTest would pay Acme was $1,010,018.00.  (Stipulated Facts at ¶ 11).

11

The Agreement provides the following with respect to payment to Acme by TolTest:

"TolTest will diligently pursue payment of SUBCONTRACTOR's invoices by its CLIENT and TolTest shall, within ten (10) days after receipt of such payment make payment to SUBCONTRACTOR.  All invoices must reference the Purchase Order Number, Job Number, include an invoice number, and completed and executed lien waivers (Exhibits 2 and 3) to be processed for payment." (Exhibit 31 at ¶ 8).

Several provisions in the parties' contract relate to delay damages.  The TolTest Acme Agreement, at paragraph 3 of Attachment A, provides that "SUBCONTRACTOR [Acme] shall not be entitled to extra compensation for any suspension, delay or acceleration not specifically allowed and paid to TolTest by its CLIENT [Whiting-Turner] for SUBCONTRACTOR's benefit." (Exhibit 33, Attachment A, at ¶ 3).  Whiting-Turner's contract with TolTest, which the parties agree was incorporated into the contract between Acme and Toltest,[4] provides that any delay must be reported in writing  and also provides that an "extension of time shall be the sole and exclusive remedy of Contractor for any such delays or suspensions, but only to the extent that a time extension is obtained from the Owner." (Ex. 44 at T-2; *See* Def.'s Br. in Opp. to Pl.'s Request for Delay Damages at 1).  The contract also states that "No claims will be accepted for costs incurred due to delays caused by others except to the extent that such delays exceed four (4) months." (Exhibit 44 at T-21).

After Demolishing The ERB, Acme Is Delayed In Demolishing The Neely Reactor:

After completing the demolition of the ERB, Acme was to demolish the Neely Reactor. The plan for demolition of the Neely Reactor involved removing and demolishing the Dome

---

[4] *See also* Exhibit 31 at 1.

portion of the Reactor first, and then demolishing the remainder of the Reactor after TolTest had abated asbestos-containing mastic from the Reactor walls.

The Project Schedule indicated that Acme was to commence removal of the Neely Reactor Dome on May 24, 2006. (Exhibit 147). TolTest's inability to abate the Dome as it had planned to do, however, prevented Acme from demolishing the Dome as scheduled.

Before Acme could demolish the Dome, Toltest had to perform abatement of certain portions of the Dome, including removing asbestos-surfacing material on the Dome and removing lead-based paint on sections of the Dome.

TolTest had insufficient staff on site to perform its abatement work as scheduled and planned. TolTest did not complete its initial abatement work in the Reactor until July 14, 2006, at which time it released the Reactor to Acme so that Acme could begin demolition of that structure. (*See* Ex. 41). Thus, while the parties had intended for Acme to begin demolishing the Reactor on May 24, 2006, TolTest delayed Acme from being able to commence that work until July 14, 2006 – 52 days later than anticipated.

TolTest's delay also caused Acme to have to change its means and methods of demolishing the Dome. Acme had planned to create an earthen ramp around the structure, bring certain equipment up on that ramp, then basically shear the Dome into pieces with equipment that resembles an enormous pair of scissors, and place the pieces on the earthen ramp to be hauled away.

Because TolTest was so far behind schedule, time did not allow Acme to use the planned method. Rather, Acme ended up "torch-cutting" the Dome into larger pie-shaped sections that it then lowered to the ground using a crane. Acme used this alternative method so that it could

save the time that it would take to build up the ground around the Reactor.

While cutting up the Reactor, Acme was delayed again when it was discovered that some areas of lead-based paint had not been removed from the top of the Dome by TolTest.  Testing caused some delay, and confirmation of the hazard required Acme's crew to upgrade the personal protection equipment that it used.  (Exhibit 85).

Meanwhile, it is apparent from the testimony and documents that Whiting-Turner was not pleased with Lint or TolTest's performance on the project.  On July 26, 2006, Whiting-Turner issued TolTest a Written Notice of Default, addressed to Lint, that indicated that TolTest was not diligently performing its scope of work and had an insufficient work force at the site.  (Exhibit 43; *see also* Exhibit 11).

Once the Dome had finally been removed, TolTest needed to abate the mastic from the walls before Acme could proceed with demolishing the remainder of the Reactor.  This next portion of the project also did not proceed as the parties had intended and planned.

The parties had agreed to have TolTest design and build a containment system around the Reactor, that would be used by Acme and TolTest to demolish and abate the remaining portion of the Reactor.

Beginning on approximately August 2, 2006, TolTest began building the original containment system, which encapsulated just a portion of the Reactor.  The original containment system built by TolTest, however, did not work properly.  It was too small, was poorly constructed, and caused the interior of the system to reach temperatures of approximately 160 degrees.  The crew could not work in such excessive heat, and the heat was causing Acme's equipment to automatically shut down.  As a result, Acme to had to bring in portable air

14

conditioning units, at additional expense.

Nevertheless, Acme exposed an area of approximately 1000 square feet of the cement walls of the Reactor. It was then TolTest's obligation to abate the mastic from those walls, but TolTest's selected method for the abatement (use of mastic remover and then handheld needle guns) was changed due to the previous fire that TolTest experienced with the mastic remover in the ERB. Because of the previous fire, TolTest decided to use a soy-based mastic remover that simply did not work. It then tried using needle guns, but that method took far more time than TolTest had planned. After TolTest worked on the 1000 square foot section for 3 full days, it was able to abate only approximately 100 square feet of the mastic. At that rate, it would have taken TolTest approximately 150 days to abate all of the concrete walls of the Reactor. Meanwhile, of course, Acme could not demolish those walls until they had been abated by TolTest.

During this mastic abatement phase, on approximately August 10th , Lint was removed as Project Manager. TolTest then had Lance Parsons ("Parson") take over primary responsibility for the project.

After Parsons took over for Lint, Parsons denied Acme access to project meetings with Whiting-Turner.

At this point, Acme was pointing out the obvious to TolTest – that TolTest's plan for this phase of the Project was not working. Parsons agreed and had TolTest build an entirely new containment system around the Reactor. The new system was a massive containment system that was built around the entire Reactor. It took approximately two weeks for TolTest to build the new system and during this time Acme could not proceed with its demolition work.

To speed the work up, Acme utilized a different method of demolishing the remaining portions of the structure.  Acme broke through the structure and worked from within the structure to demolish the concrete walls.  Because TolTest had abandoned its plan to abate the asbestos from the walls, the construction debris was considered asbestos-containing material and therefore had to be wrapped before being hauled away.

After only working a few hours, on August 29, 2006, there was a thunderstorm that damaged the enclosure.  At this point, Whiting-Turner was still unhappy with TolTest's performance.  To appease Whiting-Turner, TolTest asked Acme to have its crews work 24 hours a day.  Because that would cost Acme more money, the parties negotiated and ultimately agreed that Acme would work overtime hours in exchange for TolTest assuming certain portions of Acme's erosion control responsibilities.

As Acme proceeded to demolish the reactor walls, it placed the wrapped debris in roll-out containers provided by TolTest.  TolTest, however, did not deliver a sufficient supply of those containers and that delayed Acme's progress. (Exhibit 168).  This debris removal took approximately 20 days.

Acme removed the parking lot at the end of August, 2006.

Acme left the work site on October 11, 2006.  This was approximately 72 days later than anticipated.

TolTest was responsible for virtually all of the delays that Acme encountered in performing its work on the Neely Reactor.

Acme's work on an unrelated project, the Jackson County Landfill Project, in Michigan did not impede or impact Acme's work on the Project.

16

The delay that Acme experienced with respect to the Neely Reactor was less than four months in duration.

With respect to the delay and interference caused by TolTest relating to the Neely Reactor, Acme incurred damages of $816,709.57.  Of that amount, $107,091.50 was additional costs Acme incurred relating to the removal of the Dome, while the remaining portion was additional costs Acme incurred in performing the remainder of its work relating to the Reactor. (Exhibit 215 B & C).

Acme Performed Additional Time and Materials Work As Directed By TolTest:

At various times during the project, Lint directed Acme to perform additional work, that the parties agreed was outside of the scope of the 01-Contract, on a time and materials ("T&M") basis.  For example, on July 27, 2006, before a written contract had been signed, ACME commenced work under Subcontract Number 11000-04 on a time and materials basis utilizing the unit prices found in the Subcontract Number 11000-01.  (Stipulated Facts at ¶ 29; Exhibit 104).

The T&M work performed by Acme at TolTest's Direction included, but was not limited to, moving TolTest's dirt around the footprint of the ERB, increased work Acme had to perform in order to meet a heightened compaction standard (the architect changed the compaction rate from that specified in the contract, from 95% to 98%, which required Acme to spend significantly more time and effort)(Exhibit 91), and performing grading work in Sector 1.  This additional work was outside of the scope of Acme's duties under the 01-Contract.

The parties agreed that Acme would be paid for this work using the rates in Exhibit 44. Specifically, those rates are found at pages T-35-1 through T-35-5.

17

At the end of each day on which Acme performed T&M work, Acme delivered to TolTest detailed documentation of the work it performed that day, the rates charged, and the crew and equipment used. (*See, e.g.*, Exhibit 66). An Acme representative physically handed these daily T&M documents to the TolTest representative in the job trailer that the parties shared on the site. In keeping the with the parties' informal course of dealings, Acme did not ask for a signed copy of the T&M documents when its representative provided them to TolTest.

Lint testified that he directed Acme to do the T&M work, that he was aware that Acme was actually performing that work, and that it was his understanding that the parties would use the T&M rates in the contract.

In addition to the daily T&M documents that Acme delivered to TolTest while the work was being performed, at the end of July and August, 2006, Acme submitted a monthly invoice to TolTest regarding the T&M charges. TolTest never objected to the daily T&M documents that Acme delivered to it while the work was being performed. In addition, TolTest never disputed the amount of any T&M invoices from Acme, never disputed that Acme had performed the work in question, and never disputed that Lint had directed Acme to perform that work.

The total amount of the T&M work performed by Acme is $399,371.85. (Exhibit 66). Of that amount, $85,217.30 was for T&M work performed by Acme during July, 2006, and the balance of $314,154.57 was for T&M work performed by Acme during August, 2006.

TolTest Improperly Denies Acme's Pay Applications 5 Through 7:

The Agreement set terms for payment at Attachment A, ¶8. Specifically, TolTest agreed to compensate Acme "as specified herein." Moreover, all invoices must be "supported by documentation that may be required by the Client (Whiting-Turner)" and "all invoices must

reference the Purchase Order Number, Job Number, include an invoice number and completed and executed lien waivers to be process for payment. Incomplete invoices will be rejected and returned to the Subcontractor (Acme.) (Stipulated Facts at ¶ 17).

To date, TolTest has paid Acme $595,402.93, for work performed through August 31, 2006 as reflected in payments made under Acme's applications 1 through 4. (Stipulated Facts at ¶ 12).

During the project, TolTest and Acme representatives would meet around the 20th of each month and review the work that Acme had completed that month. Acme would then draft a pay application, billing TolTest for that work. The pay applications were based on the percentage of work complete and were broken down into line items.

TolTest's payment applications 5-7 reflected several changes orders agreed to by the parties. Acme's pay applications 5 (Exhibit 140), 6 (Exhibit 141) and 7 (Exhibit 142) on the O1-Contract total $408,869.00.

TolTest rejected Acme's payment applications 5-7. (Stipulated Facts at ¶ 13).

Representatives from TolTest told Acme's representatives, at various times after Acme had submitted its pay applications, that Acme was not getting paid for pay applications 5, 6 & 7 because TolTest had not been paid by Whiting-Turner or because Acme had not submitted the required lien waivers. Representatives from TolTest did not dispute, within a reasonable time after receiving them, Acme's payment applications 5-7 on any other basis.

TolTest also used those pay applications as leverage with Acme, and advised that TolTest would not pay Acme for its pay applications under the 01-Contract until the parties had settled Acme's claim for work performed on a T&M basis. (Exhibit 182).

19

Despite TolTest's representations to Acme, TolTest was fully paid by Whiting-Turner.

In addition, Acme supplied TolTest with all the required lien waivers (partial and full) from its subcontractors.  (Exhibit 210).

Acme met all conditions precedent for payment under the contract with respect to pay applications 5, 6 and 7.

TolTest still owes Acme $408,869.00 for Acme's pay applications 5-7 on the 01-Contract.

Because TolTest refused to pay Acme for its pay applications 5-7, and refused to pay Acme for the T&M work it performed, Acme was forced to pay its subcontractors out of its own pocket.   Acme had to use its line of credit to do so, which caused Acme to incur $136,800.00 in interest.

<u>Setoff by Toltest:</u>

After Acme demobilized from the site, TolTest discovered utilities during excavation activities to include piping and wire under the new building footprint. (Stipulated Facts at ¶ 21).  TolTest self-performed the removal of the remaining utilities at a cost of $5,650.37.  (Stipulated Facts at ¶ 22).  TolTest was required engage the services of a subcontractor to use ground penetrating radar over the entire site to ensure that all utilities had been now removed.  RHD Services performed the ground penetrating radar service for $2,775.00. (Stipulated Facts at ¶ 23).  Accordingly, the parties agree that TolTest is entitled to a set-off of $8,425.37 from the damages awarded to Acme.

**Legal Analysis And Conclusions Of Law**

Acme's claims against Toltest and Berkley are: claim on payment bond; breach of

contract; quantum meruit; and account stated.  The Court's legal analysis, and its conclusions of

law, relating to these claims are set forth below.

Claim On Payment Bond:

    With respect to Acme's claim on payment bond, the parties stipulated, on the record, that

to the extent any judgment is render against Toltest in this action, that Toltest and Berkley are

jointly and severally liable for that judgment.  (*See* 3/27/08 Trial Tr.).  Accordingly, TolTest and

Berkley are jointly and severally liable for the judgment in this action.

Account Stated Claim:

    "It has long been established under Michigan[5] law that '[a]n account stated means a

balance struck between the parties on a settlement; and where a plaintiff is able to show that the

mutual dealings which have occurred between two parties have been adjusted, settled, and a

balance struck, the law implies a promise to pay that balance.'" *Price v. Annuity Investors Life

Ins. Co.*, 244 Fed. Appx. 654, 661 (6th Cir. 2007)(quoting *Watkins v. Ford*, 69 Mich. 357

(1888)).  The Michigan Supreme Court has made clear that the conversion of an open account

into an account stated is an operation by which the parties assent to a sum as the correct balance

due from one to the other.  In order to demonstrate that its fees for services to TolTest had

become an account stated, Acme has to prove that TolTest either expressly accepted the bills by

paying them or failed to object to them within a reasonable time.  *Price*, 244 Fed. Appx. at 661;

*Keywell and Bosenfeld v. Bithell*, 254 Mich.App. 300, 331 (2002).

    As this Court noted in its January 28, 2008 Opinion & Order, an account stated claim can

_____

    [5]The parties agreed that Michigan law applies to Plaintiff's account stated claim.  (*See*
Joint Pretrial Order, ¶ 8, at page 11).

be established by failing to object to bills within a reasonable time.  In denying summary judgment on this claim, this Court noted that although there was evidence submitted to indicate that TolTest did not pay some of the payment applications that Acme sent to it (Pay Applications 5, 6 and 7), the evidence submitted to the Court indicated that TolTest communicated to Acme that Acme was not getting paid on those pay applications because Whiting-Turner had not yet paid TolTest, or because Acme had not submitted the required lien waivers.  Defendants had not submitted any evidence to the Court to indicate that TolTest communicated to Acme, within a reasonable time following receipt of the payment applications, that it was not paying the applications submitted because it disputed the amounts owed, the quality or quantity of work done or any other aspects of the work.  Thus, this Court concluded that there was an issue of fact as to Acme's account stated claim.  (1/28/08 Opinion & Order at 16-17).

Now, after hearing all the testimony at trial, the Court concludes that Acme has established an account stated claim under Michigan law in the amount of $408,869.00, the total amount of Acme's payment applications 5, 6 & 7 submitted under the 01-Contract.  Acme submitted payment applications 5-7 to TolTest, along with all of the required documentation. After receiving those payment applications, however, TolTest's representatives advised Acme's representatives that Acme was not getting paid for payment applications 5-7 because: 1) TolTest had not been paid by Whiting-Turner; and/or 2) Acme had not submitted all the required lien waivers.  TolTest did not communicate to Acme, within a reasonable time following TolTest's receipt of payment applications 5-7, that TolTest was not paying the applications because it disputed the amounts owed, the quality or quantity of work done by Acme, or any other aspects of the work.

Quantum Meruit Claim:

Under Michigan[6] law, the doctrine of quantum meruit allows a party to recover the reasonable value of services rendered. *Kamalnath v. Mercy Mem. Hosp.*, 194 Mich.App. 543, 551 (1992). The theory underlying quantum meruit recovery is that the law will imply a contract in order to prevent unjust enrichment when one party inequitably receives and retains a benefit from another. *Morris Pumps v. Centerline Piping, Inc.*, 273 Mich.App. 187, 194 (2006).

With respect to the T&M work that Acme performed, quantum meruit relief is appropriate because TolTest directed Acme to do that additional work, TolTest was aware that Acme was performing that additional work and submitting daily reports regarding same to Toltest, and TolTest was benefited by that work. *See Jarosz v. Caesar Realty, Inc.*, 53 Mich.App. 402 (1974).

The additional work that Acme performed for TolTest on a T&M basis was outside of the scope of Acme's duties under the 01-Contract. Moreover, the 01-Contract's provision requiring written change orders for additional work does not bar relief in this case because the facts clearly show that Toltest waived that requirement because it was aware of the requirement but nevertheless verbally ordered the changes. *Jarosz, supra.* Thus, the Court concludes that an agreement for compensation for this additional work done on the 01-Contract can, and must, be implied under these circumstances. *Id.*

Breach Of Contract Claim:

The parties agree that Ohio law applies to Plaintiff's breach of contract claim. To recover

---

[6]The parties agreed that Michigan law applies to Plaintiff's quantum meruit claim. (*See, e.g.*, Def.'s Motion for Summary Judgment, Docket Entry 34 at 6; Pl.'s Response to same, Docket Entry No. 37 at 14; Def.'s Proposed Findings of Fact and Conclusions of Law at ¶ 15).

under a breach of contract claim under Ohio law, a plaintiff must demonstrate by a preponderance of the evidence that: 1) a valid contract existed; 2) the plaintiff fulfilled its obligations; 3) the defendant failed to fulfill its obligations; and 4) the plaintiff incurred damages a result of that failure. *Lawrence v. Lorain Cty. Community College*, 127 Ohio App.3d 546, 548-49 (1998).

Here, there is no dispute that a valid contract, the 01-Contract, existed between TolTest and Acme. The Court concludes that Acme performed its obligations under the 01-Contract, but that TolTest failed to fulfill its obligations under the contract. TolTest breached the contract by failing to pay Acme for pay applications 5-7 after Acme had submitted all the documentation required under the contract to support those applications. TolTest also breached the contract by failing to diligently commence, pursue and complete its work on the project. TolTest's delays, and inability to proceed with its work as planned and scheduled, delayed Acme's work on the project. Acme incurred significant damages as a result of TolTest's breaches.

Damages:

The parties have raised some legal issues with respect to the type of damages that can be recovered by Acme with respect to its breach of contract claim.

The first, and most significant issue, is whether Acme can recover delay damages from Defendants given certain language in the contract.

Acme contends that the contractual language that prohibits damages for delay is void and unenforceable under O.R.C. §4113.62. It bases its argument on the language in the statute itself.[7]

---

[7]Acme further contends that, even if the above statute did not exist, the Court should still allow Acme to recover delay damages. It asserts that even before the statute, no damages for delay clauses have been held unenforceable by Ohio courts where the delay for which recovery

TolTest argues that Acme cannot recover delay damages because Acme did not comply with the required contractual requirements for seeking delay damages. TolTest relies on the following cases: *Dugan & Meyers Const. Co., Inc. v. Ohio Dept. Of Admin. Svs*., 113 Ohio St.3d 226 (2007) and *B.I. Chipping Co. v. R.F. Scurlock Co.*, 2005 WL 3484306 (Ohio App. 2005). It asserts that the *Dugan* court allowed delay damages to be limited to deadline extensions and allowed no monetary recovery at all. It contends that the *B.I. Chipping* court found that portions of a construction subcontract limiting recovery of delay damages to amounts recovered by a contractor was enforceable and did not violate §4113.62(C).

Although there is little case law interpreting the Ohio statute at issue that precludes no-damages-for-delay clauses in construction contracts, based on the statute and the few decisions that do exist, the Court concludes that the contract's provisions regarding delay damages are void and unenforceable under the statute and that Acme can therefore recover delay damages in this action.

It is undisputed that the statute at issue, O.R.C. §4113.62, was in effect at the time the contracts in this case were signed. The statute provides, in pertinent part, that:

> Any provision of a construction subcontract, agreement, or understanding, or specification or other documentation that is made part of a construction subcontract, agreement, or understanding, that waives or precludes liability for delay during the course of a construction subcontract when the cause of the delay is a proximate result of the owner's or contractor's act or failure to act, or that waives any other remedy for a construction subcontract when the cause of the delay is a proximate result of the owner's or contractor's act or failure to act, is void and unenforceable as against public policy.

---

was sought was not reasonably contemplated by the parties at the time of contracting. *JWP/Hyre Elec. Co. of Indiana v. Mentor Village School Dist.*, 968 F.Supp. 356 (N.D. Ohio, 1996).

O.R.C. §4113.62(C)(2). There is very little case law, however, applying this statute. The following three cases discuss and interpret the statute: 1) the *Dugan* case cited by TolTest and distinguished by Acme; 2) the *B.I. Chipping* case cited by TolTest; and 3) a very recent case cited by neither party, *Cleveland Const., Inc. v. Ohio Public Emp. Retire. Sys*., 2008 WL 885841 (Ohio.App. April 3, 2008).

The Court concludes that the *Dugan* decision relied on by TolTest has no real application to this case because, unlike the situation in this case, the contract at issue in *Dugan* was entered into **before** the effective date of the statute that bars no damages for delay provisions. *See Dugan*, 113 Ohio.St.3d at 232. Nevertheless, Ohio courts have noted that the Supreme Court of Ohio "strongly intimated" in that case "that if the contract had been entered into post R.C. 4113.62, the contract's no-damages-for-delay provisions would have been unenforceable." *Cleveland Const., Inc., supra*, at *5.

In *B.I. Chipping*, the appellate court affirmed a grant of summary judgment in favor of the contractor. The trial court had found that because the contract allows the subcontractor to recover for delays in the amount that the contractor received through a particular claims process, and therefore did not preclude all liability for delays, § 4113.62(C) did not render any provisions of the contract unenforceable. The appellate court agreed that "the contract as a whole did not preclude damages for delay" and affirmed the trial court's ruling.

Unlike the situation seen in *B.I. Chipping*, however, this is not a contract that simply limited recovery of delay damages to those amounts that a contractor or subcontractor received through a specified claims process. Rather, the contract at issue here also contains additional provisions that state that an extension of time shall be the exclusive remedy for delays and a

26

provision limiting remedies for delays to situations where the delay exceeds four months.  Thus, unlike the situation seen in *B.I. Chipping*, the Court concludes that the contract at issue here, construed as a whole, precludes or waives damages for delay.

The Court finds the most recent case applying the statute, *Cleveland Const.*, to be quite instructive.  In *Cleveland Const.*, a jury found that a project owner materially breached its contract with a contractor by failing to properly schedule and coordinate the project's various tasks.  The jury awarded $640,298 in damages for the loss of efficiency caused by the owner's breach.  Prior to the case going to the jury, the owner had moved for directed verdict, asserting that under the contract's terms, the contractor had waived its right to collect damages.  The trial court denied that motion, concluding that the waiver provision was unenforceable under R.C. 4113.62(C)(1).

The appellate court affirmed the ruling.  The appellate decision noted that the contract's provisions included the following:  Section 6.1.1.5, which stated that the sole remedy for interference, disruption and delay shall be an extension of time; Section 6.3.1, which also stated that an extension of time shall be the sole remedy for delay; and Section 6.4.1, which required the contractor to request an extension of time in writing.

The court explained that the "statute's apparent purpose is to prevent owners [and contractors] from escaping liability when they have caused a project delay."  *Id*. at *4.  "The statute does not simply preclude recovery of 'delay damages,' rather, it precludes the waiver of *liability for delay*."  (emphasis in original).  "Liability, in this context, means consequences – [an owner or contractor] cannot cause a delay, and then avoid the natural consequences for causing the delay by using boilerplate contract language."  *Id.*

27

The court concluded that the Section 6.1.1.5, which stated that the sole remedy for delay would be an extension of time, is unenforceable and does not preclude a delay damages award. *4. The court also concluded that Section 6.3.1 of the contract is unenforceable because it purports to limit the remedies available to the contractor in the event the owner causes a delay:

> Section 6.3.1 purports to limit [the contractor's] sole remedy to an extension of time, which violates R.C. 4113.62(C)(1). Section 6.3.1 is therefore invalid as well.

*Id*. at *4. The court also rejected the owner's contention that the trial court should have granted a directed verdict because the contractor failed to request an extension of time in writing, as required by Section 6.4.1 of the contract, explaining:

> Here, because R.C. 4113.62(C)(1) prohibits a limitation of remedies for delay caused by the owner, [the contractor] was not required to request an extension of time as its sole remedy for delay.

*Id.* at *6.

The Court concludes that, like the situation in *Cleveland Const*., the contract provisions at issue in this case, which bar, limit or waive delay damages that are caused by the owner or contractor, are unenforceable under O.R.C. § 4113.62. That statute provides that any provision in a construction subcontract that waives or precludes liability for delay, when the cause of the delay is a proximate result of the contractor's act or failure to act, is void and unenforceable as against public policy. O.R.C. §4113.62(C)(2). In this case, the contract provisions at issue include that any delay must be reported in writing and an "extension of time shall be the sole and exclusive remedy of Contractor for any such delays or suspensions, but only to the extent that a time extension is obtained from the Owner" (Ex. 44 at T-2; *See* Def.'s Br. in Opp. to Pl.'s Request for Delay Damages at 1), and that "No claims will be accepted for costs incurred due to

delays caused by others except to the extent that such delays exceed four (4) months." (Exhibit 44 at T-21). Thus, the contract as a whole precludes, limits or waives liability for delay, even when the cause of the delay is a proximate result of TolTest's actions or failures to act. The Court therefore concludes that these provisions are therefore void and unenforceable and do not preclude recovery of delay damages by Acme in this case.

A second legal issue is whether Acme has established, under Ohio law, that it is entitled to its claimed administrative costs using the Eichleay formula. Acme seeks a total of $423,691.60 for unabsorbed home office expenses, which Acme calculated using the Eichleay formula.

TolTest contends that Acme has not established that it can receive damages for administrative overhead costs using the Eichleay formula under *Complete Gen. Const. Co. v. Ohio Dept. of Transportation,* 94 Ohio.St.3d 54 (2002), and the Court agrees.

Under Ohio law, "[b]efore the Eichleay formula may be applied, the contractor must demonstrate two important elements in order to establish a prima facie case for the award of damages. First, the contractor must demonstrate that it was on 'standby.'" *Complete Gen. Const. Co.*, 94 Ohio.St.3d at 58. A contractor is on standby when work on a project is suspended for a period of uncertain duration and the contractor can at any time be required to return to work immediately. *Id.* "In effect, the contractor is not working on the project, yet remains bound to the project. The contractor must be ready to immediately resume performance at any time." *Id*. "The second element in a prima facie case is that the contractor must prove that it was unable to take on other work while on standby. *Id*.

The evidence indicates that, at various times, Acme's work on the 01-Contract was

29

suspended or delayed.  At other times, however, Acme was still able to perform some limited

work on the project, despite the delays caused by TolTest.  Moreover, Acme was able to perform

additional work on the project, such as the T&M work in Sector 1, and in fact performed such

work.  Acme's proofs were simply not presented in a manner that allows the Court to parse out

the time periods when Acme was truly on standby mode, and could not any perform work under

the 01-Contract or additional T&M work.  The Court concludes that Acme has failed to

demonstrate entitlement to overhead damages under the Eichleay formula as required under Ohio

law.  The Court therefore declines to award Acme its requested damages for unabsorbed

overhead.

The Court concludes that Acme has established by a preponderance of the evidence that it

is entitled to the following damages from Defendants:

1) $408,869.00 for work performed under the 01-Contract;

2) $399,371.87 for additional work performed on T&M basis at TolTest's request;

3) Delay damages of $1,088,715.15, which are comprised of the following amounts: $272,005.58 in delay damages for the delay relating to Acme's work in the ERB; and $816,709.57 in delay damages for the delay relating to Acme's work in the Reactor; and

4) $136,800.00 in interest that Acme had to pay as a result of TolTest improperly withholding payment from Acme.

Thus, Acme's damages total $2,033,756.02.  Because TolTest is entitled to setoff of $8,425.37,

however, the award to Acme is reduced to $2,025,330.65.

## VIII.  Conclusion

For the reasons set forth above, the Court concludes that Acme is entitled to damages in the amount of $2,025,330.65.  The parties are hereby directed to meet and confer in order to submit to the Court, within fourteen (14) days of the date of this Opinion, a proposed final judgment, which includes calculation of applicable interest.


S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  May 5, 2008

I hereby certify that a copy of the foregoing document was served upon counsel of record on May 5, 2008, by electronic and/or ordinary mail.


S/Jennifer Hernandez
Case Manager